UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

06 CV 1637

MATHILDE FREUND,
LEO BRETHOLZ,
FREDDIE KNOLLER
KURT SCHAECHTER,
RAYMOND BONI,
PIERRE CHANOVER,
ABRAHAM DRESDNER,
MARGOT FEIGENBAUM,
JACOB HECHT,
SOLOMON HECHT
GINETTE KALISH,
BEATRICE KARP,
MAURICE KORNBERG,
RUDOLPH LOEBEL,
REGINA LOEBEL,
RAYMOND MAGER,
BERTHE BANIA PALUMBO,
SUSAN PHILLIP,
INGEBORG PRICE,
MARGUERITE ELIAS QUDDUS
SUZANNE RINGEL,
SUZANNE RAPPOPORT RIPTON,
VERA REICHMAN,
COLETTE RORLS-THOMASSIN,
MAURICE SALCFAS, and
LILIANE SCHIMKOVITZ
on behalf of themselves and
all others similarly situated,



CLASS ACTION COMPLAINT

Civ. (    )2006

PLAINTIFFS DEMAND A
TRIAL BY JURY

Plaintiffs,

-against-

THE REPUBLIC OF FRANCE,
SOCIÉTÉ NATIONALE DES CHEMINS
  DE FER FRANÇAIS, and
CAISSE DES DÉPÔTS ET CONSIGNATIONS,

Defendants.
----------------------------------------------------------X

1. **INTRODUCTION**

    1. Plaintiffs seek compensation for personal property in France taken during World War II in violation of international law. By their attorneys, Plaintiffs bring this action, both individually and on behalf of other Holocaust victims, their heirs and beneficiaries, against the Republic of France ("France"), Société Nationale des Chemins de Fer français ("SNCF"), and the Caisse des Dépôts et Consignations ("CDC"), (collectively the "Defendants"), for compensatory and punitive damages, and equitable disgorgement of profits.

    2. At issue in this case are rights in Property taken in violation of international law. This taking of Property occurred in the course of the arrest, imprisonment and deportation of Jews and other "undesirables" by the Defendants during World War II (the "War"). As used hereinafter, "Property" means any and all personal property, including cash, securities, silver, gold, jewelry, works of art, musical instruments, clothing, and equipment that was illegally, improperly, and coercively taken from the ownership or control of an individual while in a holding or transit camp or on a train between camps in France or on a train to death or slave labor camps in other countries. Property also includes moneys earned from the sale of such Property.

    3. Plaintiffs and the heirs and beneficiaries of the victims seek an accounting, disgorgement, restitution, and the recovery of damages arising out of the participation of Defendants in a common scheme and course of conduct to obtain, accept, conceal, convert and profit from Property taken by, deposited in, or liquidated through, the Defendants.

    4. Defendants committed, conspired to commit and aided and abetted others who committed war crimes and crimes against humanity.

1

## II. BACKGROUND

5. Unless otherwise indicated, the "Background" Section of this Complaint is stated upon information and belief, based on published research concerning activities at Drancy and other French camps during the War and SNCF's activities during and after the War. Information on the taking of Property at Drancy and the provincial camps, and the role of the CDC comes primarily from reports of the Matteoli Commission ("Matteoli"), established by the French government in 1997 to investigate the spoliation of Jewish Property during the War.

6. During the War, 75,000 Jews and tens of thousands of other "undesirables" were shipped from holding camps in France to Nazi death camps like Auschwitz and Buchenwald. Less than 3% survived.

7. France established and ran holding camps in France during the War. Those in the camps were forced to "deposit" money and other assets when they arrived. Then the deportees were searched. What they tried to hide on themselves or in the camp buildings was taken by the French Gendarmerie and deposited in camp accounts and ultimately at the CDC. They were searched again before being deported to Auschwitz or Buchenwald.

8. SNCF assembled and ran the trains that transported Jews and other "undesirables" between holding camps in France. SNCF also assembled and ran the trains from the holding camps to Auschwitz and Buchenwald. Deportees were forced by SNCF to turn over their suitcases and other valuables when they were loaded on the trains; what was taken from them was never returned.

9. The CDC, the national public depository of France, accepted, held, and is holding today, Property consisting of money taken from the Plaintiffs, or money received from the sale of Plaintiffs' non-monetary Property.

2

### A. The role of the French government.

10. The first round up of Jews occurred in May 1941 and filled the provincial holding camps at Pithiviers and Beaune-la-Rolande. The first round-up in Paris took place between August 20 and 25, 1941, when 4,232 Jews of all nationalities were herded into the holding camp at Drancy, opened by the French government as an internment camp and beginning in March 1942 as a transit camp. The Nazis took control of Drancy in July 1943.

11. 80,000 people passed through Drancy. Of those, 60,000 deportees came from the provincial camps; those included more than 40,000 Jews of foreign origin, including Jews from Belgium and Holland. Drancy was a way-station on the road to Auschwitz.

12. When they arrived at the holding camps, internees were forced to turn over money and other objects of value. More Property was taken by the camp managers, who sometimes used the money as working capital.

13. The taking of Property at the camps was organized and systematic. For example, at Drancy, an accounting system was established, internees were given receipts, and the funds were deposited at the CDC. Ultimately, however, the number of internees there was so great that the system was overwhelmed. Individual accounts were no longer opened, but the spoliation continued. Funds taken from internees were deposited regularly on a weekly schedule.

14. Although most of the archives of the camps outside of Paris have disappeared, Matteoli found that an average amount taken from detainees at those camps was 3,237 francs, and based on the 60,000 Jews interned in the provincial camps, Matteoli determined that the total estimated amount taken from detainees at the provincial camps was around 200,000,000 francs. This amount does not include the value of jewelry or other property.

3

15. 12,039,892 francs came from those interned at Drancy through 1943; an additional 3,000,000 francs came from internees at Pithiviers and Beaune-la-Rolande. (Unless otherwise stated, all references in the complaint are to French francs of the period.) This does not include money or other assets taken when deportees were searched upon arrival.

16. Most of the Property was never restituted.

### B. The Role of SNCF.

17. Deportees from holding camps throughout France were sent to Drancy and Compiègne by SNCF trains, then again by SNCF trains to Auschwitz and Buchenwald. SNCF deported more than 75,000 Jews in 72 Convoys. The last convoy left France on D-Day.

18. The deportees were generally allowed to bring one suitcase or parcel with them when they were herded onto the SNCF trains. Once on the trains, SNCF took the suitcases and other valuables, telling the victims that the Property would be returned to them. It was not.

### C. The role of the CDC.

19. CDC was a major beneficiary of the antisemitic legislation that authorized the taking of Jewish assets. Such legislation specifically provided that the CDC was to be the depository for revenues arising from the spoliation of Jews throughout France.

20. The CDC was the depository for most of the funds spoliated from the Jews and other detainees in the holding camps. The CDC was also the recipient of funds, both during and after the War, arising from the sales and auctions of Jewish Property.

21. The first deposit of funds from detainees at Drancy was June 3, 1942. Of the 12 million francs taken from Drancy internees alone and deposited at the CDC, Matteoli determined that, as of 1999, 9,733,308 in contemporary francs was still on deposit.

22. Other Property, including jewelry, gold coins and foreign currency was stashed in a vault at the Banque de France. Some of the non-claimed property was auctioned off in 1951, 1952 and 1954. Proceeds from those sales were deposited at the CDC. Matteoli determined that the amount of those funds as of September 1954 was 100 million francs.

23. Although France has a 30 year escheat statute, Matteoli found that laws pertaining to escheat were not followed. For example, public notice required by law was not given. Matteoli concluded that any substantial reversion to the Public Treasury of the internees' money deposited at the CDC did not take place.

## III. THE PARTIES

### A. Defendants.

24. The Republic of France is a foreign state, as defined in 28 U.S.C. § 1603(a).

25. Société Nationale des Chemins de Fer français is incorporated and has its principal place of business in France. SNCF is the national railway of France and the operator of all rail passenger lines within France. It was created in 1938 by the consolidation of five existing French regional rail networks and is wholly owned by the French government. SNCF is one of the 500 largest corporations in the world. As discussed below, SNCF, through agents and subsidiaries located in New York State, does business in this State and in this District.

26. The CDC earns millions of dollars in the New York financial markets through its capital markets group, CDC Capital, Inc. and its consolidated subsidiaries. It offers commercial mortgage-backed securities, provides insurers, broker/dealers and bankers with means to securitze or hedge credit exposures. It manages more than 300 U.S. corporate pension plans, develops derivatives-based structures and issues commercial paper. It also manages municipal

bond and securities funds. In 1999, the CDC's capital markets group in New York reported consolidated net revenues of $188 million.

### B. Plaintiffs

27. Mathilde Freund is an American citizen who lives in New York. During the war, her husband was arrested and sent from Lyon Prison to Fort-Mont-Luc, then to Compiègne, and then to Buchenwald. He had gold watches, diamond rings, wedding bands, and Swiss francs. His possessions were taken by SNCF on the train from Paris to Lyon. She, her mother and her father were forcibly stopped from taking their possessions with them when they arrived at Gare de PerrachE. Everything they had was forcibly taken from them in the camps. SNCF and French government officials participated in such confiscation.

28. Leo Bretholz is an American citizen who lives in Maryland. He was moved from Rivesaltes to Drancy and then deported to Auschwitz. Prior to getting on the train in Drancy, the camp guards ordered him to take off his gold ring with his initials on it, his Bar Mitzvah ring, and his gold "Omega" chronometer, and leave those possessions with the guards. He was also forced to leave a leather valise, 50-100 francs and a stamp collection. The guards who took his possessions were the French Police. Mr. Bretholz was given a voucher listing what was taken from him, and he was told not to lose it. All of the deportees around him were forced to leave all of their Property behind and were also given vouchers detailing the possessions that had been taken. Mr. Bretholz escaped from Convoy No. 42 before it arrived at Auschwitz.

29. Alfred Knoller is a British citizen who lives in England. He was born in Vienna and went to France following Kristallnacht. He was arrested and put in a holding camp at St. Cyprian. He escaped, made his way to Paris, then to Figeac where he joined the Resistance. Turned over to the Gestapo by his girlfriend, he was tortured and then sent to Drancy, from

6

where he was deported to Auschwitz on October 7, 1943. He had a suitcase with clothes, a gold watch, a valuable stamp collection and a diamond ring. He also had a cello at Drancy which he was not allowed to take with him. On the train to Auschwitz, SNCF forced him to leave the suitcase and the other valuables on the train.

30. Kurt Werner Schaechter is a French citizen who lives in France. His mother was deported by the last train from Camp Noé. Everything she had with her was taken. SNCF and French government officials participated in such taking.

31. Raymond L. Boni is an American citizen who lives in New York. Members of his family were taken to Drancy and then deported to Auschwitz. His family entered Drancy with all of the possession they could carry. All of his family's Property was taken from them when they entered Drancy. Both SNCF and French government officials were involved in the takings.

32. Pierre E. Chanover is an American citizen who lives in Florida. His father was shipped from Drancy to Auschwitz on Convoy No. 5. He was trying to take whatever he could, and was carrying cash, gold, and other valuables, such as a gold watch, that could have been used for bartering. His father was stripped of all of his belongings by French government officials.

33. Abraham Dresdner is an American citizen who lives in New York. During the war, he and his family were shipped from Clermont-Ferrand to Rivesaltes. They had money, jewelry, clothes and suitcases. At each location, more and more was taken, and then everything they had left, even their shoes, was taken at Rivesaltes. SNCF participated in this confiscation.

34. Margot Feigenbaum is an American citizen who lives in New York. SNCF trains transported her uncle to Auschwitz. He had silver, china, clothes, family photos and other valuables with him and was not allowed to take anything on the train. SNCF was involved in the taking of his Property.

7

35. Jacob Hecht is an American citizen who lives in Florida. His brother Solomon Hecht, also an American citizen, lives in Massachusetts. Their brother Albert was captured in a round-up in Nice, France and deported to Auschwitz in Convoy No. 60. Their father, Leon Hecht, captured at the Swiss border, was sent to Drancy, and then by Convoy No. 75 to Auschwitz. Mr. Hecht's father was carrying gold, money, jewelry, a suitcase and clothes, all of which were taken away by SNCF and French government officials. Both Albert and Leon died in Auschwitz.

36. Ginette Kalish is an American citizen who lives in Florida. She and her mother were on an SNCF train on their way to the south of France trying to escape. SNCF pointed them out to the French government officials who took her mother's wedding band, diamond ring and bracelets as well as their money, clothing and suitcases. She and her mother were taken to Camp Gurs on SNCF trains. By the time they arrived at Camp Gurs, all they had left were the clothes on their backs.

37. Beatrice Karp is an American citizen who lives in Nebraska. Her sister, Susan Philipp lives in Illinois. During the war, they and their parents were taken to Camp Gurs, then to Rivesaltes, then to Drancy and then to Auschwitz. Money and other possessions were taken at Drancy by French officials. Ms. Karp remembers French officials ripping her mother's earrings out of her ears; she still remembers her mother crying out in pain.

38. Maurice Kornberg is an American citizen who lives in California. He, his father, mother, and brother, were transported by SNCF from Perpignan to Drancy, and then to Auschwitz on June 23, 1943. His family had four or five suitcases with them containing jewelry, money and clothes. SNCF and French government officials took everything away from them. He remembers that the SNCF "Drancy cattle car scene was mayhem, eerie."

39. Rudolph Loebel is an American citizen who lives in California. During the war, his parents were taken by SNCF trains from Camp Recebedoux to Rivesaltes, from Rivesaltes to Drancy and from Drancy to Auschwitz. Before getting on the train at Drancy, his father was forced by French gendarmes to hand over his gold watch, French and Swiss money, and a suit case with personal belongings. His father had a few gold pieces sewn in the overcoat, which was taken from him in Drancy by a French gendarme. The gendarme took the coat because the SNCF station master told him "take it."

40. Regina Loebel is an American citizen who lives in California. During the War, she and her mother were moved from Karlsruhe to Gurs to Rivesaltes, and in 1942 her mother was sent to Drancy. A suitcase with valuables was taken from them on the train to Gurs. The gendarmes took her knapsack with all her savings and good clothes. Her mother was robbed of everything by force. There were many children and some of her classmates were on the trains. Everything was taken, and everyone was afraid to say anything because the gendarmes were so fierce and took what they wanted without mercy.

41. Raymond Mager is a French citizen who lives in France. His father was imprisoned at Drancy, then shipped to Auschwitz. When taken to Drancy, he had money and other valuables. Before being shipped to Auschwitz, all his possessions were taken by SNCF.

42. Berthe Bania Palumbo is an American and a French citizen who lives in New York. Her parents were deported by train from Paris to Auschwitz on Convoy No. 59 on September 2, 1943. SNCF and French government officials forcibly took Property and possessions from them.

43. Ingeborg Price is an American citizen who lives in New Jersey. During the war, her father was shipped by SNCF train from Drancy to Auschwitz. Clothing, money, and valuables

9

such as his ring and watch were forcibly taken from him. SNCF and French government officials participated in such confiscation.

44. Marguerite Elias Quddus is a Canadian citizen who lives in Quebec, Canada. The night of December 12, 1941, her father was sent from Drancy to Compiègne; on March 27, 1942, he was sent to Auschwitz. He had a valise, his wedding band, and his watch. Her mother sent packages to him at the camps with money hidden inside. On arrival at Drancy, he was given a receipt for 85 francs that he "deposited." Ms. Quddus has a copy of a letter that he wrote asking for items to be sent so that he could exchange them for food. Most was taken by the French gendarmes at the camps.

45. Suzanne Ringel is an American citizen who lives in Florida. Her mother was deported from Rivesaltes, her father from Drancy. Her mother had a wedding ring, a watch, gold earrings and money. Her father had a wedding band, a watch and money with him. All of these possessions were taken by SNCF and French government officials.

46. Suzanne Rappoport Ripton is a British citizen who lives in West Yorkshire, United Kingdom. During the War, her parents were deported from Drancy to Auschwitz on SNCF trains. She remembers her parents putting their most precious belongings in their suitcases; those suitcases were taken. SNCF was responsible for this confiscation.

47. Vera Reichman is an American citizen who lives in New York During the war, she and her parents were put on an SNCF train to be sent from Rivesaltes to Drancy. Everything they had was taken. At the very last minute, she was taken off the train, her parents were not. French government officials participated in this confiscation.

48. Colette Rorls-Thomassin is a French citizen who lives in France. During the war, she, her father, and her mother were forcibly deported on SNCF trains from Nice to Drancy.

They had valises with them that contained the most valuable things they owned, including silver and hidden gold pieces. When they were forced to get on the trains, the valises were taken by SNCF; they were told that their Property would be returned at Drancy. It was not: SNCF never returned their valuables. They were searched again by French government officials when they arrived at Drancy and what they had hidden on their persons was taken.

49. Maurice Salcfas is an American citizen who lives in New Jersey. His mother was sent by SNCF train to Auschwitz. Before getting on the train, she was forcibly stripped of everything she had. SNCF and French government officials took her Property.

50. Liliane Schimkovitz is a French citizen who lives in France. Her mother was sent on SNCF trains from Drancy to Auschwitz by Convoy No. 8 on February 13, 1942, as was her grandfather. Her mother had jewelry, including a bracelet, a gold watch and chain, earrings, and a diamond wedding band. Her grandfather had a wedding band and gold watch. Everything they had was taken from them. SNCF and French government officials participated in such taking.

## IV. CLASS ACTION ALLEGATIONS

51. This action is brought and may properly be maintained as a class action pursuant to the provisions of Fed. R. Civ. P. 23(a) and (b)(3). The Class includes all those individuals interned in holding and concentration camps in France or transported by SNCF to holding camps in France or to the Nazi death and slave labor camps during the War, and their respective heirs and beneficiaries.

52. The members of the Class on whose behalf Plaintiffs bring this action are too numerous to make joinder of all members of the Class practicable. Although the identities of all individual Class members are unknown at present, they can be ascertained through appropriate discovery and public inquiry.

53. There are questions of fact and law common to the Class that predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class are whether:

   a. France wrongfully took money and other assets from Plaintiffs when they were interned at Drancy and other holding and transit camps while those camps were under the control of the French government;

   b. SNCF wrongfully took gold, money and other personal belongings from Plaintiffs and Class members during transit from holding camps in France to other camps and from such camps in France to concentration and slave labor camps in other countries;

   c. The CDC wrongfully received, maintained and profited, and still maintains and profits from, the funds deposited with it both during the War and thereafter as a result of the sales of Property;

   d. Defendants improperly retained or converted Property;

   e. Defendants unjustly benefitted financially from their actions;

   f. Defendants' actions were in violation of international law; and

   g. Defendants participated in a common plan or conspiracy to commit crimes under international law.

54. Plaintiffs' claims are typical of claims of other members of the Class, because all such claims arise from Defendants' intentional taking and retention of Property from detainees in the holding camps and from SNCF's intentional taking and retention of Property from detainees during transit.

55. Plaintiffs are committed to the vigorous prosecution of their claims and have competent counsel experienced with complex litigation, class action litigation, and litigation related to wrongful conduct during the War.

## V. JURISDICTION AND VENUE

### A. Subject Matter Jurisdiction

56. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because all Plaintiffs' claims involve substantial international law and federal questions, and because all Plaintiffs' claims arise under international law enforceable in this Court as federal law.

57. This Court has subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act 28 U.S.C. § 1605 (3) ("FSIA," 28 U.S.C. §§ 1330, 1602 *et seq.*) which denies immunity to foreign states for cases where rights in property have been taken in violation of international law.

58. This Court also has subject matter jurisdiction over this action pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350, which grants jurisdiction of civil actions by aliens for torts committed in violation of the law of nations. SNCF and the CDC are French corporate entities, and certain Plaintiffs are aliens seeking redress for torts committed in violation of the law of nations. The law of nations is enforceable in this Court as federal law.

59. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and general principles of supplemental jurisdiction.

### B. Personal Jurisdiction

60. This Court has personal jurisdiction over the Republic of France under the New York State Civil Practice Law and Rules ("CPLR") § 301. The Republic of France engages in and receives the benefit of tourism and business revenues through advertising in New York conducted by various agencies of the French government located in New York, including the French Government Tourist Office and the offices of the French Commercial and Consular

13

Attachés that promote French tourism and business interests in the United States. France owns residential and commercial property in New York.

61. This Court has personal jurisdiction over SNCF under CPLR § 301. SNCF does substantial, continuous and systematic business in the State of New York and in this District. SNCF sells tickets in the United States through its agents and subsidiaries, Rail Europe Group, Inc. and Rail Europe, Inc., Delaware corporations with offices in Westchester County, New York (collectively, "Rail Europe"). Rail Europe maintains a website for the use of U.S. travel agents in booking tickets on SNCF, and confirms reservations for SNCF tickets immediately. Upon information and belief, Rail Europe is the exclusive agent for the sale of all SNCF tickets and rail passes purchased within the United States, and earns substantial revenue through sales of tickets within the State of New York and in this District.

62. SNCF has purposefully availed itself of the privilege of conducting business within New York State such that it can reasonably anticipate being haled into district courts located in New York State in litigation. Indeed, according to published judicial opinions, when sued in the federal district courts in New York State in the past, SNCF has not even attempted to claim that the court lacked personal jurisdiction.

63. This Court has personal jurisdiction over the CDC under CPLR § 301. As set forth in Paragraph 26, the CDC has purposefully availed itself of the privilege of conducting business within New York State such that it can reasonably anticipate being haled into district courts located in New York State in litigation.

64. Personal jurisdiction in this matter also meets the requirements of the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution. The Defendants' continuous and systematic business activities in New York State constitute

sufficient minimum contacts with this State to make the exercise by this Court of personal jurisdiction reasonable and consistent with traditional notions of fair play and substantial justice.

65. This Court has personal jurisdiction over the Defendants under the FSIA because these are claims as to which no party is entitled to immunity under 28 U.S.C. § 1605-7.

**C. Venue**

66. Venue is appropriate pursuant to 28 U.S.C. § 1391.

## VI. CLAIMS FOR RELIEF

### A. First Claim for Relief - Violations of International Law

67. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

68. During the War, Defendants, by their own conduct individually took, and in concert with each other, aided and abetted and conspired to take, the Property of Plaintiffs, in violation of international law, both customary and treaty, by taking Property on a discriminatory basis, for no public purpose and without just compensation.

69. Consequently, Defendants have committed war crimes and crimes against humanity under international law and the law of nations. International law and the law of nations is enforceable in this Court.

70. Defendants' unlawful and tortuous conduct as described herein was done intentionally, maliciously and wantonly, and Plaintiffs are thereby entitled to an award of punitive damages as well as compensatory damages.

71. By reason of the foregoing, Plaintiffs have been damaged in amounts to be determined at the trial of this action, exclusive of interest and the costs of prosecution of this

action, and are entitled to an amount of punitive damages also to be determined at the trial of this action.

### B. Second Claim for Relief - Conversion

72. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 71 as if fully set forth herein.

73. Defendants have willfully and wrongfully taken, retained and converted the Property and its derivative profits into their own property, and Defendants' exercise of the rights of ownership and control over the Property were and are inconsistent with Plaintiffs' rights, were and are without authorization, and such acts constitute a conversion.

74. By their seizure of the Property, Defendants have injured all Class Members by depriving them of their Property, its use and enjoyment, and any interest and profit which could have been earned thereon.

75. As a result of such conversion, Plaintiffs and other class members are entitled to the return of the Property or compensation therefor, and damages in an amount to be determined at trial.

### C. Third Claim for Relief - Accounting

76. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 75 as if fully set forth herein.

77. The Defendants have failed to return Property to their rightful owners and have intentionally and wrongfully concealed from the Plaintiffs information about the Property and the value and profits derived therefore.

78. An accounting is necessary to determine the rights of the Plaintiffs since the Defendants are in the best position to provide the relevant information regarding the Property.

79. At all relevant times, Plaintiffs had and continue to have legal and equitable interests in the Property and have at no time been lawfully deprived of such interest in any manner that conforms with minimal requirements of due process of law.

80. Defendants were entrusted with the Property or came into possession of the proceeds of the Property. Defendants have failed to provide adequate information as to the status of the Property since the end of the War and have not offered any restitution or compensation, or have offered inadequate restitution or compensation, to the Plaintiffs for their unlawful retention of those assets or the profits which Defendants have derived from that Property.

### D. Fourth Claim for Relief - Equitable Disgorgement of Profits/Unjust Enrichment

81. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 80 as if fully set forth herein.

82. By reason of the forgoing, Defendants have unjustly enriched themselves with the derivative profits of such assets and investing, and otherwise profited from that Property.

83. By reason of Defendants' conduct as described herein, Defendants have earned profits from their acts committed in violation of international law.

84. By reason of the foregoing, SNCF should be compelled to disgorge the amounts by which it profited from its wrongful conduct in taking Property on and during the operation of its deportation trains during War and to make restitution to Plaintiffs and the Plaintiff Class in an amount to be determined at the trial of this action, exclusive of interest and the costs of prosecution of this action.

85. By reason of the foregoing, France and the CDC should be compelled to disgorge the amounts by which they profited from the taking and sale of the Property and should be required

to make restitution to Plaintiffs and the Plaintiff Class in an amount to be determined at the trial of this action, exclusive of interest and the costs of prosecution of this action.

### E. Equitable Tolling and Estoppel

86. No statute of limitations has begun to run on the causes of action stated herein because Plaintiffs and the Plaintiff Class have been kept in ignorance of vital information essential to pursue their claims, without any fault or lack of diligence or due care on their part. Information about the Defendants' participation in wrongdoing has come to light only recently as a result of the work of the Matteoli Commission and was not available prior to its creation. Some archives are still closed to the general public.

87. Moreover, Defendants' misconduct is continuing. Defendants have not made any reasonable attempt to disgorge their illicit profits or adequately compensate victims and are estopped from interposing any type of time bar defense to these claims.

**WHEREFORE,** Plaintiffs request that this Court:

1. Certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. On the First Claim for Relief, award compensatory and punitive damages to Plaintiffs and the Plaintiff Class;

3. On the Second Claim for Relief, compel SNCF to disgorge the profits it earned from the taking of Property during the transportation of French civilians from holding camp to holding camp within France and during the deportation of Plaintiffs to the Nazi death and slave labor camps;

4. On the Second Claim for Relief, compel the CDC to disgorge the profits it earned from the deposit of cash from the internees of the holding camps in France and from the proceeds of the sale of the non-monetary Property;

5. On the Third Claim for Relief, compel the Defendants to provide an accounting and identification of all Property, including all profits derived therefrom;

6. On the Fourth Claim for Relief, compel the Defendants to disgorge the profits they earned from the Property of the Plaintiffs;

7. On all Claims for Relief, award interest on all amounts awarded including, without limitation, pre-judgment interest as applicable;

8. Award the costs, disbursements and reasonable attorneys' fees incurred in the prosecution of this action; and

9. Grant such other and further relief as the Court shall deem just, equitable and proper.

Dated: 1 March 2006
New York, New York

*Attorneys for Plaintiffs*:

| Tamen Law Offices | Abbey Gardy, LLP | Professor Lucille A. Roussin |
|---|---|---|
| By: *[signature]* | By: *[signature]* | *[signature]* |
| Harriet Tamen | Stephen T. Rodd | (LR 1056) |
| (HT 6112) | (SR 8228) | |
| 405 Park Avenue | 212 East 39th St. | 101 West 90 St. |
| 15th Floor | New York, NY  10016 | New York, NY  10024 |
| New York, NY  10022 | (212) 889-3700 | (212) 877-9746 |
| (212) 583-1453 | | |

*Of Counsel*:

Professor Malvina Halberstam
Benjamin Cardozo School
of Law

Gregory Tesoro, Esq.
Tamen Law Offices

19