UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Freund, et al.                                             Civil Action No. 06 CV 1637 (KMK)

Plaintiffs

v.

The Republic of France
Société Nationale des Chemins de Fer Français
Caisse des Dépôts et Consignations,

Defendants

## STATEMENT OF Gérard Gélineau-Larrivet
## IN SUPPORT OF THE MOTION TO DISMISS MADE BY
## THE REPUBLIC OF FRANCE

Gérard Gélineau-Larrivet states the following:

1. I hold the position of Chairman of the Commission for the Compensation of Victims of Spoliation ("CIVS" or the "Commission"). I am submitting this statement in support of the motion from the Republic of France for dismissal of a class action alleging the spoliation of certain personal property assets during the Second World War.

2. As Chairman of the CIVS, I am familiar with all aspects of it, including those pertaining to its creation and purpose, the processing of claims for spoliations, the types of claims examined and the methods of compensation of victims.

**Creation and Objectives of CIVS**

3. The CIVS was instituted by decree No. 99-778 dated September 20, 1999, amended by decree No. 2000-932 dated September 25, 2000.

4. The CIVS is charged with examining individual claims submitted by victims or by their successors in interest for the compensation of losses due to the spoliations of property that occurred due to anti-Semitic legislation enacted during the Occupation, both by the Occupier and by the Vichy authorities. It may receive any claim relating to spoliations concerning financial or material property that occurred in French territory. That may concern looting of personal property, business materials, liquidations of commercial or artisanal businesses that were placed under "provisional administration," confiscations of valuables and jewelry, and spoliations of works of art. Spoliations may also have been perpetrated by financial institutions and banks, or any institution, legal entity or individual.

5. The Commission is non-judicial in nature; it does not render decisions but rather issues recommendations to the Prime Minister or the concerned institutions. However, those parties have committed to implementing the decisions.

6. No decision of the French courts regarding the scope accorded to CIVS recommendations has been brought to my attention.

[initials]

1

7. The recommendations that have been issued have always been given effect, pursuant to the commitments made by the Prime Minister and the banks.

**CIVS Services**

8. The CIVS has three divisions: the administrative units, which compile the dossiers and search the archives; the rapporteurs, who prepare the dossiers and propose an appraisal of the losses; and the hearings secretariat, which prepares the agenda of Commission meetings.

9. In May 2006, 22,637 dossiers had been recorded by the CIVS since its creation, including 7,613 banking claims. It made 18,477 recommendations for compensation of victims of spoliations, all losses combined, including 11,010 for material spoliations (looting of apartments or workshops, jewelry, works of art, etc.) and 7,467 banking spoliations. On average, full processing of those claims takes 24 months; bank claims are processed within about nine months. Instructions are given to grant priority to claims from elderly persons who have directly been victims of spoliations, and persons with health problems and/or financial difficulties.

Processing of dossiers: administrative unit – research network

10. Any person, regardless of his/her country of residence, who has been the victim of a material and/or financial spoliation, in connection with anti-Semitic legislation enacted during the Second World War in French or equivalent territory, may appeal to the CIVS. The claimant may act personally or on behalf of other successors in interest. Furthermore, it is not necessary to have formal evidence to file a claim. To initiate the proceeding, it is sufficient to send a postal letter, a fax or an email message to the CIVS. Claimants may also download the form from the website, print it and return it to the CIVS, because sending the duly filled out form engages the authority of the Commission. Subsequently, the claim is recorded by the dossier-opening unit. The claimant then receives a notice of receipt accompanied by a questionnaire to be filled out and a power of attorney that authorizes the CIVS to conduct the necessary searches concerning the claimant and the property in question. The procedure is free of charge and does not require any special formality. A third party who has been designated by the claimant and holds power of attorney may also appeal to the Commission.

11. The questionnaire must be filled out in such manner as to give maximum information to the Commission (complete civil status of the claimant, nature and location of the confiscated property, capacity of other persons involved, etc.). Any document that might clarify the investigation of the dossier may also be attached to the questionnaire.

12. and 13. After registration of the questionnaire, receipt of which is acknowledged, the dossier is forwarded by the administrative unit to the verification network for archival searches. That service coordinates the querying of the different archive centers based on the spoliations described in the questionnaire. Initially, the main task of the head of the verification network is to identify the multiple natures of spoliations based on a reading of the questionnaire and the documents that have been placed in the dossier. Then the case officers of the Commission send the copies of the documents contained in the claim to the different archive centers (e.g., the CIVS satellite office at the National Archives, which holds information on war damages, the CIVS satellite office at the Paris Archives, but also the prefecture of police of Paris and the Center of Contemporary Jewish Documentation, the CDC [Caisse des Dépôts et Consignations], the Office of Private Interests and Property, the Department of Museums of France at the Ministry of Culture, and the Department of Archives at the Ministry of Foreign Affairs, the French Federation of Insurance Companies) so that they can conduct searches in existing archive holdings. All requests are also sent to the CIVS satellite office in Berlin, to verify whether there has already been compensation by the German government under the Brüg law.

[initials]
2

Investigation of Dossiers: Rapporteurs

14. The rapporteurs are active or retired judges, belonging to judicial, administrative or financial courts, who have been appointed to the Commission by order of the Minister of Justice.

There are 31 of them. Active judges devote two days per week to the work of the Commission; since recently, retired judges devote three days per week.

They are under the authority of a principal rapporteur, who is himself a judge, and their mission, pursuant to the decree of September 10, 1999, is to investigate the claims, i.e., to assemble the information for evaluating the existence and extent of spoliations and to quantify the loss that resulted therefrom.

15. The rapporteurs do not represent any organization or institution. They are appointed "to the Commission" but they do not represent it and their analyses and opinions are not binding on it, as indicated in their reports.

The Commission may also enjoin them to conduct any additional investigation that it considers useful.

16. To the full extent possible, the rapporteurs contact the claimant or the person who has power of attorney to represent the claimant. That contact occurs by personal meeting, either at the office of the Commission or at the domicile of the person concerned, if his state of health prevents him from traveling, or by telephone. It may also occur by letter. It enables the rapporteurs to find out about the circumstances of the spoliation, to make sure that the circumstances do not contain instances of spoliation that the claimant failed to indicate in his claim, to question the claimant, if appropriate, about the history of his family, to explain the rapporteur's work to him and to hear his comments on the proposed compensation that is to be made.

17. The rapporteur prepares compensation proposals, considering the nature and extent of spoliations whose existence he esteems proven, and any compensation paid by the German authorities under the Brüg law and by the French authorities by way of war damages.

To evaluate the losses resulting from the spoliation of apartments, he refers to the criteria (classification of premises, number of rooms, number of occupants) used by the Brüg law and the law on war damages.

Material and banking losses are appraised as of the date at which they were committed, then restated in present value using restatement coefficients based on the buying power of the euro, published each year by the INSEE (National Institute of Economic Studies and Statistics).

The value of businesses and companies that were confiscated is reconstituted based on a number of rules contained in specialized reference works or after consultation of relevant business organizations. To appraise stolen works of art whose essential characteristics are known, the rapporteurs request an expert appraisal from the Department of Museums of France. Absent that, for paintings and sculptures, they try to determine their average value by consulting the "Benezit," a reference work specialized in the prices of the best known works of art.

When the characteristics of an asset cannot be known precisely, the rapporteurs propose a lump-sum appraisal.

[initials]
3

18. The claimant is not bound by the rapporteur's proposal, which is generally sent to him for comments. He may challenge it both during the investigation and before the Commission, even if he has previously approved it.

Should he so request, the claimant receives a copy of the report. He may also consult the dossier and obtain a copy of the documents that are of use to him for asserting his rights. It is not uncommon that, absent any request, the rapporteur may take the initiative to send the claimant a copy of the documents that support his proposals or are of historical interest for the victims and their families.

19. The reports are submitted to the principal rapporteur, who forwards them to the hearings secretariat, orienting them toward a sub-commission or plenary session of the Commission, depending on the difficulty of the problems that they raise.

20. The claimant may be represented not just by an attorney but by any person of his choosing. That representative is the rapporteur's contact for conducting the investigation, which does not prevent him from contacting the claimant directly when it is necessary to obtain clarification of his personal memories. A claimant who has appointed an agent to represent him may make direct contact with the rapporteur who is investigating the claim.

Hearings Secretariat and Deliberating Board

21. The Hearings secretariat is composed of three permanent members of the CIVS. The deliberating Board is composed of nine members: two Supreme Court justices (Mr. Gélineau-Larrivet, honorary chamber chairman and Chairman of the Commission), two members of the Conseil d'Etat (François Bernard, honorary member of the Conseil d'Etat and Vice-Chairman of the Commission, and Mr. Henri Toutée, member of the Conseil d'Etat), two magistrates at the Auditor General's Department (Mr. Jean-Pierre Bady, Conseiller maître, and Mr. Pierre Parthonnaud, honorary Conseiller maître), two university professors (Mr. David Ruzié, university professor emeritus, and Ms. Anne Grynberg, professor at the National Institute of Eastern Languages and Civilizations) and two prominent figures (Mr. Gérard Israël, member of the executive committee of the Representative Council of Jewish Institutions of France, and Mr. Kauffmann, secretary general of the Association of the Memorial of the Unknown Jewish Martyr and the Center of Contemporary Jewish Documentation, former general director of the Representative Council of Jewish Institutions of France).

22. Claimants are advised of the date of the hearing and are invited, should they wish to do so, to express again their comments before the deliberating Board, which adopts the final compensation recommendation. To enable foreign claimants to attend Commission hearings, on several occasions the Commission has traveled to Israel and the United States.

23. It is the task of the hearings secretariat to prepare the agenda of meetings of the deliberating Board. The deliberating Board sits either in plenary session (quorum: six members) or as a sub-Commission (quorum: three members). The assignment of claims is based on their complexity. Hearings are conducted as follows: the rapporteur makes his report, which, in the event of his absence, is read by the hearing secretary; the members of the deliberating Board hear the claimant and ask the rapporteur and the claimant any questions that they consider useful. They also listen to the comments from the government commissioner who has received the dossier. The claimant has the floor last. The Commission then adopts a recommendation in its deliberation. The Chairman of the CIVS may also rule alone pursuant to the decree of June 20, 2001, "when the personal situation of the claimant necessitates rapid processing of his dossier or the matter does not pose any special difficulty." However, the examination by the board is a right should the claimant so desire. The decree of June 20, 2001 further provides that claimants may challenge a recommendation "issued by the commission in reduced formation" or "examined by the commission in plenary formation, without first undergoing an examination in reduced formation"; "the chairman shall

grant the request for a new examination unless the information submitted in support of it clearly appears to be insufficient to call the recommendation into question."

24. The recommendations for compensation, for which the State is responsible, are sent to the offices of the Prime Minister (compensation unit), which contact the beneficiaries. Recommendations that have become decisions of the Prime Minister are then sent to the ONAC [Office National des Anciens combattants = National Office of Former Combatants] for payment. Recommendations for which banks are responsible are under the authority of two Funds, the "Deposit" (Fund A) and the "Fund" (Fund B), which are administered by the Unified Jewish Social Fund (FSJU) [Fond Social Juif Unifié], which orders the expenditures at the CDC, which pays them.

### Spoliations that Entitle Victims to Reparation, Restitution or Compensation

25. Under decree No. 99-778 dated September 10, 1999, losses due to spoliations of material and financial property entitle the victims to reparation, restitution or compensation through the procedure of the CIVS. Physical injury or emotional suffering are not within the field of compensation. Furthermore, they must be spoliations that occurred due to anti-Semitic legislation. Spoliations may have been perpetrated by the State, but also by public or private persons (insurance companies, banks or the Caisse des Dépôts et Consignations, etc.)

### Bank Spoliations

26. A banking satellite office of the CIVS, which coordinates searches for bank spoliations, was set up following the Washington Agreement dated January 18, 2001. A bank request is created when the claimant mentions a bank either implicitly in the questionnaire or explicitly by archive documents that the claimant has submitted. Also, consultation of the "aryanization" dossier of the National Archives may also reveal one or more accounts of businesses and trigger the creation of banking dossiers.

27. Funds A and B were set up pursuant to the Washington Agreement. Those two funds are fed by banks that hold monies that were not returned after the Second World War. When the bank holdings are identified after searching in the archival funds, the compensation is paid from the fund of $50 million, "the Deposit" (fund A). If, after searches, the Commission is not able to establish the existence of bank holdings, the Commission relies on the credible evidence that is presented to it and that is attested to by a sworn statement. That document, completed by the claimant, entitles him to an initial lump sum of $1,500. That sum is deducted from the "Fund" (fund B), which has $22.5 million. Pursuant to the provisions of the Washington Agreement, that fund has been placed under the supervision of a management committee composed of five members: two appointed by the United States, two by France and one by the attorneys that are parties to the agreements.

28. Banking compensation, in practice, does not leave any room for double compensation.

29. The banking satellite office conducts searches directly within the Commission in the computer files of frozen accounts using a CD-Rom provided by the Matteoli Commission by order dated October 19, 2000. The computer data of each bank are assembled there. The banking satellite office does a systematic query of the Bank CD-Rom even if the claimant mentions just one bank explicitly. The frozen-account files consist of about 80,000 accounts for about 60,000 names recorded on the lists of the Office of the General Commissioner for Jewish Matters (CGQJ) [Commissariat Général aux Questions Juives], which are kept at the National Archives. The computer files of frozen accounts are distributed among 26 files corresponding to 25 banks, which have themselves conducted searches, and one file compiled by the Matteoli Commission, consisting of 160 other banks. A computer search of the frozen-account files is positive when the civil status and/or address of the spoliation victim corresponds to a civil status and/or an address identified in the files. The search establishes the types of holdings, cash

accounts, securities accounts or safe-deposit boxes possessed at one or more banks. A negative search means that no correspondence of the civil status and/or address has been found in the frozen-account files. In that case, and only for a dossier submitted to the CIVS before February 2, 2005, the processing of it is continued by written request asking the claimants for a sworn statement as to the existence of holdings during the Occupation, in the event that sworn statement is not already attached to the questionnaire. Regardless of the search result, the case officer of the banking satellite office confirms it by a document that validates that inquiry.

Other Spoliations

30. Lootings of personal property, confiscations of real estate, valuables and jewelry and liquidities of deportees at the time of their internment in camps in France, spoliations of works of art and business losses also entitle victims to reparation, restitution or compensation through the CIVS procedure (merchandise inventories, raw materials and finished products confiscated, equipment and fixtures seized, damaged or destroyed, loss of intangibles when the "aryanization" of the business led to its liquidation and/or any information in the statements made to the Office of Private Interests and Property that has not resulted in compensation).

31. Since the Commission started its work on May 31, 2006, the average value of material compensation granted has been 27,200 euros.

**Compensation for confiscated assets**

32. Question does not apply for the signer.

33. For material claims, payment is made by the National Office of Former Combatants (ONAC), within a time period that, to my knowledge, is six to eight months after the recommendation. Similarly, bank-related claims are paid within one month by transfer from the CDC to the account of the beneficiaries.

34. Subject to the above information, claimants compensated from Fund B are entitled to an initial lump sum of $1,500. Claimants compensated from Fund A are compensated in the amount of the holdings identified, adjusted to present value; they are assured a minimum of $3,000.
An exchange of diplomatic letters, signed between the French and US governments on February 21, 2006, adding to and amending the Washington Agreement, devised four new compensation measures in favor of spoliation victims. The first measure permits the granting of $15,000 to any direct survivor of the Holocaust born before 1945, who resided in France between 1940 and 1945, still alive as of January 11, 2006, and who has already received or will receive, for his own holdings, compensation under the Washington Agreement. The second measure provides for additional compensation up to $10,000 for any person who has received or will receive compensation for an attested account in the amount of $3,000 to $10,000, either under the Washington Agreement or as holder or successor in interest of a holder of an account managed under provisional administration compensated out of the State budget. The third measure allocates an additional sum of $1,000 per account to any person who has received or will receive compensation of less than $3,000 for a personal or business account. Because that measure applies to attested holdings, claims accompanied by affidavits are not eligible for this compensation. The threshold of $3,000 mentioned in these last two measures is the result of a second round of compensation of an additional $1,500 (or in addition to compensation in an amount less than $3,000) granted to the beneficiaries of banking compensation previously paid by the banks or by the State, whose amount is less than $3,000. This stipulation took effect after the signing of previous exchanges of diplomatic letters, on August 7 and 10, 2001 and on February 2, 2005. Lastly, the fourth measure sets the bar date for negative banking dossiers at February 2, 2005. After the claimant signs a sworn statement, it permits the allocation of $3,000 drawn from Fund B, i.e.,

[initials]

6

$1,500 under the first round of compensation and an additional $1,500 under the second round. It should be stated that this bar date, which was initially set at July 18, 2002, had previously been pushed back to January 18, 2003 by the exchange of diplomatic letters dated May 30 and 31, 2002.

* *<br>*

I state, under penalty of perjury pursuant to the laws of the United States of America, that the aforementioned information is accurate and true.

Signed June 21, 2006 in Paris

[signature]

Gérard Gélineau-Larrivet



STATE OF NEW YORK        )
                         )
                         )   ss
                         )
COUNTY OF NEW YORK       )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from French into English of the attached statement of Gérard Gélineau-Larrivet, dated June 21, 2006.

_[signature]_

Robert Adler, Senior Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me this 26 day of June, 2006.

_[signature]_
BRANDON CARNEY
Notary Public, State of New York
No. 01CA6122227
Qualified in New York County
Commission Expires February 7, 20__

New York
259 West 30th Street, 17th Floor
New York, NY 10001
tel 212.631.7432  fax 212.631.7778
www.geotext.com
e-mail translations@geotext.com

San Francisco
220 Montgomery Street, 3rd Floor
San Francisco, CA 94104
tel 415.576.9500  fax 415.520.0525
www.geotext.com
e-mail sanfrancisco@geotext.com

London
107-111 Fleet Street
London EC4A 2AB
tel +44 (0)20 7936 9002  fax +44 (0)20 7990 9909
www.geotext.com
e-mail london@geotext.com

UNITED STATES DISTRICT COURT
*(TRIBUNAL D'INSTANCE DE DISTRICT)*
DISTRICT SUD DE NEW YORK

Freund, et al.                                       Action civile n° 06 CV 1637 (KMK)

Plaignants

- contre –

La République française,
Société Nationale des Chemins de Fer français,
Caisse des Dépôts et Consignations,

Défendeurs

## DECLARATION DE Gérard GÉLINEAU-LARRIVET POUR APPUYER LA DEMANDE DE REJET PRESENTEE PAR LA RÉPUBLIQUE FRANCAISE

Gérard GÉLINEAU-LARRIVET déclare ce qui suit :

1. J'exerce les fonctions de Président de la Commission pour l'indemnisation des victimes de spoliations (la « CIVS » ou la « Commission »). Je soumets la présente déclaration pour appuyer la demande de la République française visant au rejet d'une plainte en action collective alléguant la spoliation de certains biens mobiliers personnels durant la deuxième guerre mondiale.

2. En tant que Président de la CIVS, j'en connais tous les aspects, y compris ceux relatifs à sa création et son objet, au traitement des requêtes au titre de spoliations, aux types de requêtes instruites et aux modes d'indemnisation des victimes.

### Création et objectifs de la CIVS

3. La CIVS a été instituée par le décret n°99-778 du 10 septembre 1999, modifié par le décret n°2000-932 du 25 septembre 2000.

4. La CIVS est chargée d'examiner les demandes individuelles présentées par les victimes ou par leurs ayants-droits pour la réparation des préjudices consécutifs aux spoliations de biens intervenues du fait des législations antisémites prises pendant l'Occupation, tant par l'Occupant que par les autorités de Vichy. Elle peut être saisie de toute demande relative à des spoliations portant sur des biens matériels ou financiers, intervenues sur le territoire français. Il peut s'agir de pillages de mobiliers, de matériels professionnels, de liquidations d'entreprises commerciales ou artisanales placées sous « administration provisoire », de confiscations de valeurs et de bijoux, de spoliations d'œuvre d'art. Les spoliations peuvent également être le fait d'organismes bancaires et financiers, de toute institution, de toute personne physique ou morale.

5. La Commission a un caractère non-juridictionnel, elle ne prononce pas de décisions mais émet des recommandations à l'attention du Premier ministre ou des institutions concernées. Toutefois, ces derniers se sont engagés à les mettre en œuvre.

6. Aucune décision des tribunaux français sur la portée qu'ils accordent aux recommandations de la CIVS n'a été à ce jour portée à ma connaissance.

1

7. Les recommandations émises ont toujours été suivies d'effet, conformément aux engagements pris par le Premier ministre et les banques.

### Les services de la CIVS

8. La CIVS comprend trois divisions : les cellules administratives chargées de la constitution des dossiers et des contrôles en archives, les rapporteurs qui instruisent les dossiers et proposent une évaluation des préjudices et le secrétariat des séances qui prépare l'ordre du jour des réunions de la Commission.

9. En mai 2006, 22 637 dossiers ont été enregistrés par la CIVS depuis sa création, dont 7 613 requêtes bancaires. Elle a formulé 18 477 recommandations pour indemnisation des victimes de spoliations, tous préjudices confondus, dont 11 010 au titre des spoliations matérielles (pillages d'appartements ou d'ateliers, bijoux, oeuvres d'art etc....) et 7 467 au titre des spoliations bancaires. Le traitement complet des demandes nécessite un délai moyen de 24 mois, les requêtes bancaires étant traitées dans un délai de l'ordre de neuf mois. Des instructions sont données pour accorder une priorité aux demandes émanant des personnes âgées qui ont été directement victimes des spoliations, des personnes en précarité de santé et/ou en difficulté financière.

### Le traitement des dossiers : la cellule administrative - le réseau de contrôle et d'investigation

10. Toute personne, quel que soit son pays de résidence, ayant été victime d'une spoliation, d'ordre matériel et/ou financier, en liaison avec des législations antisémites survenue lors de la Seconde Guerre mondiale sur le territoire français ou assimilé, a la possibilité de s'adresser à la CIVS. Le requérant peut agir à titre personnel ou pour le compte d'autres ayants droit. En outre, il n'est pas nécessaire pour déposer une demande de disposer de preuves formelles. Pour initier la procédure, il suffit d'adresser un courrier postal, une télécopie ou un courrier électronique à la CIVS. Les requérants peuvent également télécharger et imprimer le formulaire sur le site Internet et le retourner à la CIVS, l'envoi du formulaire dûment rempli valant saisine de la Commission. Par suite, la demande est enregistrée par la cellule de constitution des dossiers. Le demandeur reçoit alors un avis de réception accompagné d'un questionnaire à remplir et d'une procuration qui autorise la CIVS à effectuer les recherches nécessaires concernant le demandeur et les biens en cause. La procédure est gratuite et ne demande aucun formalisme particulier. La Commission peut également être saisie par un tiers désigné par le requérant et doté d'un pouvoir.

11. Le questionnaire doit être rempli de manière à donner le maximum d'informations à la Commission (état civil complet du demandeur, nature et localisation des biens spoliés, qualité des autres personnes concernées...). Il peut être également joint au questionnaire tout document susceptible d'éclairer l'instruction du dossier.

12. et 13. Après enregistrement du questionnaire dont il est accusé réception, le dossier est transmis par la cellule administrative au réseau de contrôle pour recherches en archives. Ce service coordonne l'interrogation des différents centres d'archives en fonction des spoliations décrites dans le questionnaire. Dans un premier temps, la tête de réseau de contrôle a pour tâche principale d'identifier les multiples natures de spoliations à partir de la lecture du questionnaire et des documents versés au dossier. Dans un second temps, les chargés de mission de la Commission transmettent les copies des documents contenus dans la requête aux différents centres d'archives (par exemple l'antenne de la CIVS aux Archives Nationales qui détiennent notamment des renseignements relatifs aux dommages de guerre, l'antenne de la CIVS aux Archives de Paris, mais également la préfecture de police de Paris et le Centre de documentation juive contemporaine, la CDC, l'Office des Biens et Intérêts Privés, la Direction des Musées de France au ministère de la Culture et la Direction des archives au ministère des Affaires étrangères, la Fédération française des sociétés d'assurances) afin que ceux-ci effectuent les recherches dans les fonds d'archives existants. Toutes les requêtes sont également envoyées à l'antenne de la CIVS à Berlin, pour vérifier s'il y a déjà eu indemnisation par le gouvernement allemand au titre de la loi Brüg.

2

### L'instruction des dossiers : les Rapporteurs

14. Les rapporteurs sont des magistrats en activité ou retraités appartenant aux juridictions de l'ordre judiciaire, administratif ou financier, nommés auprès de la Commission par arrêté du Garde des Sceaux, Ministre de la Justice.

Au nombre de 31, ils consacrent aux travaux de la Commission, deux jours par semaine pour les magistrats en activité et, depuis une date récente, trois jours par semaine pour les magistrats retraités.

Placés sous l'autorité d'un rapporteur général, lui-même magistrat, ils tiennent du décret du 10 septembre 1999 la mission d'instruire les demandes, c'est à dire de rassembler les éléments permettant d'apprécier l'existence et l'étendue des spoliations ainsi que d'évaluer le préjudice qui en est résulté.

15. Les rapporteurs ne représentent aucun organisme ou institution. Ils sont nommés « auprès de la Commission » mais ils ne la représentent pas et ne l'engagent pas par leurs analyses et leurs avis, comme cela est indiqué dans leurs rapports.

La Commission peut d'ailleurs leur enjoindre de procéder à tout supplément d'information qu'elle estime utile.

16. Les rapporteurs prennent, dans toute la mesure du possible, contact avec le requérant ou avec la personne qui a mandat de le représenter. Ce contact a lieu par entretien, soit au siège de la Commission ou au domicile de la personne concernée si son état de santé lui interdit tout déplacement, soit par téléphone. Il a lieu également par lettre. Il permet aux rapporteurs de s'informer des circonstances de la spoliation, de s'assurer qu'elles ne révèlent pas des chefs de spoliation que le requérant a omis de signaler dans sa demande, d'instruire le demandeur, s'il y a lieu, sur l'histoire de sa famille, de lui expliquer la démarche du rapporteur et de recueillir ses observations sur les propositions d'indemnisation que celui-ci se propose de formuler.

17. Le rapporteur établit des propositions d'indemnisation en prenant en compte la nature et l'étendue des spoliations dont l'existence lui paraît établie, ainsi que les indemnités éventuellement versées par les autorités allemandes au titre de la loi BRüG et par les autorités françaises au titre des dommages de guerre.

Il se réfère pour évaluer les préjudices résultant de la spoliation des appartements, aux critères (classement du local, nombre de pièces, nombre d'occupants) pris en compte par la loi BRüG et la loi sur les dommages de guerre.

Les préjudices tant matériels que bancaires, sont évalués à la date à laquelle ils ont été réalisés puis actualisés par application des coefficients d'actualisation du pouvoir d'achat de l'euro, publiés chaque année par l'INSEE (Institut National de la Statistique et des Études Économiques).

La valeur des fonds de commerce et des entreprises spoliés est reconstituée à partir d'un certain nombre de règles figurant dans des ouvrages spécialisés ou après consultation d'organisations professionnelles concernées. Pour l'évaluation des œuvres d'art volées dont on connaît les caractéristiques essentielles, les rapporteurs sollicitent l'expertise de la Direction des Musées de France. A défaut, ils essaient de déterminer, pour les tableaux et les sculptures, leur valeur moyenne par consultation du « Benezit », un ouvrage de référence pour le cours des œuvres d'art les plus connues.

Lorsque les caractéristiques d'un bien ne peuvent être connues avec précisions, les rapporteurs proposent une évaluation forfaitaire.

18. Le requérant n'est pas tenu par la proposition du rapporteur qui lui est généralement communiquée pour observations. Il peut la contester tant au cours de l'instruction que devant la Commission, même s'il y a antérieurement adhérée.

Le requérant reçoit, s'il en fait la demande, une copie du rapport. De même, il peut consulter le dossier et se faire remettre copie des pièces qui lui sont utiles pour faire valoir ses droits. Il n'est pas rare qu'en l'absence de demande, le rapporteur prenne l'initiative de faire parvenir au requérant copie des pièces de nature à justifier ses propositions ou susceptible de présenter un intérêt historique pour les victimes et leurs familles.

19. Les rapports sont remis au rapporteur général qui les transmet au secrétariat des séances en les orientant vers une formation restreinte ou une formation plénière de la Commission en fonction de la difficulté des problèmes qu'ils soulèvent.

20. Le requérant peut être représenté non seulement par un avocat, mais par toute personne de son choix. C'est avec cette dernière que le rapporteur entre en relation pour mener à bien l'instruction, ce qui n'exclut pas qu'il s'adresse directement au requérant lorsque il est nécessaire d'obtenir des précisions relevant de ses souvenirs personnels. Rien n'interdit au requérant qui a désigné un mandataire pour le représenter d'intervenir directement auprès du rapporteur qui instruit sa demande.

<u>Le secrétariat des séances et le Collège délibérant</u>

21. Le Secrétariat des séances est composé à ce jour de trois membres permanents de la CIVS. Le Collège délibérant est quant à lui composé de dix membres : deux magistrats du siège de la Cour de Cassation (M. Gélineau-Larrivet, président de chambre honoraire et Président de la Commission, et M. Bernard Boubli, conseiller doyen honoraire), deux conseillers d'État (François Bernard, conseiller d'État honoraire et Vice Président de la Commission, et M. Henri Toutée, conseiller d'État ), deux conseillers maîtres à la Cour des Comptes (M. Jean-Pierre Bady, conseiller maître et M. Pierre Parthonnaud, conseiller maître honoraire), deux professeurs d'université (M. David Ruzié, professeur des universités émérite et Mme Anne Grynberg, professeur à l'Institut National des Langues et Civilisations Orientales) et deux personnalités qualifiées (M. Gérard Israël, membre du comité directeur du Conseil représentatif des institutions juives de France et M. Kauffmann, secrétaire général de l'Association du mémorial du martyr juif inconnu et du Centre de documentation juive contemporaine, ancien directeur général du Conseil représentatif des institutions juives de France).

22. Les requérants sont avisés de la date de la séance et sont invités, s'ils le souhaitent, à exprimer à nouveau leurs observations devant le Collège délibérant qui adopte la recommandation finale d'indemnisation. Pour permettre aux requérants étrangers d'assister à des séances de la Commission, celle ci s'est déplacée à plusieurs reprises en Israël et aux Etats-Unis.

23. Le secrétariat des séances est chargé d'élaborer l'ordre du jour des réunions du Collège délibérant. Celui-ci siège soit en formation plénière (quorum : six membres), soit en formation restreinte (quorum : trois membres). L'affectation des dossiers est fonction de leur complexité. Les séances se déroulent comme suit : le rapporteur expose son rapport qui, en cas d'absence, est lu par le secrétaire des séances; les membres du Collège délibérant entendent le requérant et posent toutes les questions qu'ils jugent utiles à l'un et à l'autre. Ils écoutent également les remarques du commissaire du gouvernement qui a eu communication du dossier. Le requérant a la parole en dernier. La Commission adopte ensuite dans son délibéré une recommandation. Le Président de la CIVS peut également statuer seul en application du décret du 20 juin 2001, « lorsque la situation personnelle du demandeur nécessite un traitement rapide de son dossier ou que l'affaire ne présente pas de difficulté particulière ». Toutefois l'examen par une formation collégiale est de droit si le requérant le demande. Le décret du 20 juin 2001 prévoit en outre que les demandeurs peuvent contester une recommandation « émise par la commission en formation restreinte » ou « examinée par la commission en formation plénière, sans avoir préalablement fait l'objet d'un examen en formation restreinte » ; « le président fait

4

droit à la demande de nouvel examen sauf si les éléments présentés à l'appui de celle-ci apparaissent manifestement insuffisants pour remettre en cause la recommandation ».

24. Les recommandations d'indemnisation, à la charge de l'État, sont transmises aux services du Premier ministre (cellule d'indemnisation), lesquels prennent contact avec les bénéficiaires. Les recommandations devenues décisions du Premier ministre sont ensuite adressées à l'ONAC pour paiement. Les recommandations à la charge des banques relèvent quant à elles de deux Fonds, le " Dépôt " (Fonds A) et le " Fonds " (Fonds B) administrés par le Fond Social Juif Unifié (FSJU) qui ordonne les dépenses auprès de la CDC laquelle les liquide.

### Les spoliations ouvrant droit à réparation, restitution ou indemnisation

25. En vertu du décret n°99-778 du 10 septembre 1999, les préjudices consécutifs aux spoliations de biens matériels et financiers ouvrent droit à réparation, restitution ou indemnisation au titre de la procédure de la CIVS. Les préjudices d'ordre physique ou moral n'entrent pas dans le champ de l'indemnisation. En outre, il doit s'agir de spoliations intervenues du fait des législations antisémites. Les spoliations ont pu être le fait de l'Etat, mais également de personnes publiques ou privées (compagnies d'assurances, banques ou la Caisse des Dépôts et Consignations...)

### Les spoliations bancaires

26. Une antenne bancaire de la CIVS, qui coordonne les recherches sur les spoliations bancaires, a été mise en place suite à l'Accord de Washington du 18 janvier 2001. Une requête bancaire est créée lorsqu'il est fait mention d'une banque par le requérant soit implicitement dans le questionnaire, soit explicitement par des pièces d'archives que le requérant aurait transmises. D'autre part, une consultation du dossier d'« aryanisation » des Archives Nationales peut également révéler un ou plusieurs comptes d'entreprises et provoquer la création de dossiers bancaires.

27. Les fonds A et B ont été mis en place conformément à l'Accord de Washington. Ces deux fonds sont provisionnés par les banques détentrices de sommes non restituées après la seconde guerre mondiale. Lorsque les avoirs bancaires sont identifiés après recherches dans les fonds d'archives, l'indemnité est payée sur le fonds de 50 millions de dollars, " le Dépôt " (fonds A). Si, après recherches, la Commission n'est pas en mesure d'établir l'existence d'avoirs bancaires, elle s'appuie sur les éléments de preuve crédibles qui lui sont transmis et qui sont attestés par une déclaration sur l'honneur. Ce document, complété par le requérant, lui donne droit à un premier forfait de 1500 dollars. Cette somme est déduite du " Fonds " (fonds B) doté de 22,5 millions de dollars. Conformément aux dispositions de l'Accord de Washington, ce fonds a été placé sous la surveillance d'un comité de gestion composé de cinq membres : deux nommés par les États-Unis, deux par la France et un par les avocats parties aux accords.

28. Les indemnisations bancaires telles qu'elles sont pratiquées ne laissent pas de place à une double indemnisation.

29. L'antenne bancaire effectue ses recherches directement au sein de la Commission sur les fichiers informatiques des comptes bloqués à l'aide d'un CD-Rom transmis par la Mission MATTEOLI par arrêté du 19 octobre 2000. Les données informatiques de chaque établissement bancaire y sont réunies. L'antenne bancaire procède à l'interrogation systématique du CD-Rom Banques même si le requérant ne fait mention que d'une seule banque en termes précis. Les fichiers des comptes bloqués comprennent environ 80 000 comptes pour environ 60 000 noms recensés dans les listes du Commissariat Général aux Questions Juives (CGQJ) conservées aux Archives Nationales. Les fichiers informatiques des comptes bloqués se répartissent entre 26 fichiers correspondant à 25 établissements bancaires ayant fait eux-mêmes leurs recherches et un fichier établi par la Mission MATTEOLI comprenant 160 autres banques. Une recherche informatique sur les fichiers des comptes bloqués se révèle positive lorsque l'état civil et/ou l'adresse de la personne spoliée correspond à un état civil et/ou à une adresse identifié dans les fichiers. La recherche permet d'établir les types d'avoirs, compte-

5

espèces, compte-titres ou coffres possédés dans une ou plusieurs banques. Une recherche négative implique que l'on n'a trouvé aucune correspondance d'état civil et/ou d'adresse sur les fichiers des comptes bloqués. Dans ce cas, et seulement pour un dossier parvenu à la CIVS avant le 2 février 2005, le traitement de celui-ci se poursuit par la demande écrite aux requérants d'une déclaration sur l'honneur certifiant l'existence d'avoirs détenus pendant l'Occupation, dans le cas où la déclaration n'est pas déjà jointe au questionnaire. Quel que soit le résultat de la recherche, le chargé de mission de l'antenne bancaire le confirme par un document qui valide cette interrogation.

<u>Les autres spoliations</u>

30. Ouvrent également droit à réparation, restitution ou indemnisation au titre de la procédure de la CIVS, les pillages de mobiliers, les confiscations de biens immobiliers, de valeurs et de bijoux et des liquidités des déportés au moment de leur internement dans les camps en France, les spoliations d'œuvres d'art et les préjudices professionnels (stocks de marchandises, matières premières et produits finis confisqués, matériels et agencements saisis, détériorés ou détruits, perte d'éléments incorporels lorsque l'"aryanisation" de l'entreprise a conduit à sa liquidation et/ou tout élément figurant dans les déclarations faites auprès de l'Office des Biens et Intérêts Privés et qui n'aurait pas abouti à une indemnisation).

31. Depuis le début des travaux de la Commission au 31 mai 2006, la valeur moyenne des indemnisations matérielles accordées s'élève à 27 200€.
**Indemnisation des biens spoliés**

32. Question sans objet pour le signataire.

33. La mise en paiement pour les requêtes matérielles est effectuée par l'Office National des Anciens Combattants (ONAC), dans un délai qui, à ma connaissance, est de six à huit mois après la recommandation. De même, les requêtes bancaires sont payées sous un mois par virement de la CDC sur le compte des bénéficiaires.

34. Sous réserve des indications ci-dessous, les requérants indemnisés sur le Fonds B ont droit à un premier forfait de 1500 dollars. Les requérants indemnisés sur le Fonds A le sont à hauteur des avoirs identifiés revalorisés, un plancher de 3 000 dollars leur étant assuré.
Un échange de lettres diplomatiques, signé entre les gouvernements français et américain le 21 février 2006, complétant et modifiant l'Accord de Washington, a arrêté quatre nouvelles mesures d'indemnisation au bénéfice des victimes de spoliations. La première mesure permet l'octroi d'une somme de 15 000 dollars à toute personne survivante directe de l'Holocauste, née avant 1945, ayant résidé en France entre 1940 et 1945, encore en vie à la date du 11 janvier 2006, et ayant déjà bénéficié ou qui bénéficiera, pour ses avoirs propres, d'une indemnisation en vertu des dispositions de l'Accord de Washington. La deuxième mesure prévoit une indemnisation complémentaire jusqu'à 10 000 dollars pour toute personne ayant bénéficié ou qui bénéficiera d'une indemnisation pour un compte attesté dont le montant est compris entre 3 000 et 10 000 dollars, soit au titre de l'Accord de Washington, soit en tant que détenteur ou ayant droit d'un détenteur d'un compte géré sous administration provisoire indemnisé sur le budget de l'État. La troisième mesure alloue une somme additionnelle de 1 000 dollars par compte à toute personne ayant bénéficié ou qui bénéficiera d'une indemnisation pour un compte, personnel ou professionnel, inférieur à 3 000 dollars. Cette mesure s'appliquant aux avoirs attestés, les demandes accompagnées d'affidavits ne sont pas éligibles à cette indemnisation. Le seuil de 3 000 dollars mentionné dans ces deux dernières mesures est la conséquence d'un deuxième tour d'indemnisation de 1 500 dollars supplémentaires (ou en complément d'une indemnisation d'un montant inférieur à 3 000 dollars) accordé aux bénéficiaires d'une indemnisation bancaire préalablement versée par les banques ou par l'État, dont le montant est inférieur à 3 000 dollars. Cette disposition a pris effet à la suite de la signature de précédents échanges de lettres diplomatiques, les 7 et 10 août 2001 et le 2 février 2005. Enfin, la quatrième mesure relève la date de forclusion des dossiers bancaires négatifs au 2 février 2005. Elle permet, après signature d'une déclaration sur l'honneur par le requérant, l'allocation de 3 000 dollars prélevés sur le Fonds B, soit

6

1 500 dollars au titre du premier tour d'indemnisation et 1 500 dollars supplémentaires au titre du second tour. Il doit être précisé que cette forclusion, initialement fixée au 18 juillet 2002 avait précédemment été reportée au 18 janvier 2003 par l'échange de lettres diplomatiques des 30 et 31 mai 2002.

\* \*
\*

Je déclare, sous peine de faux témoignage conformément aux lois des Etats-Unis d'Amérique, que les informations susmentionnées sont exactes et conformes à la vérité.

Signé le 21 juin 2006 à Paris

Gérard GÉLINEAU-LARRIVET

7