# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

————————————

Nᵒ 06 Civ. 1637 (RJS)

————————————

MATHILDE FREUND, LEO BRETHOLZ, FREDDIE KNOLLER, *et al.*, *individually and on behalf of all other persons similarly situated*,

Plaintiffs,

VERSUS

THE REPUBLIC OF FRANCE, SOCIÉTÉ NATIONALE DES CHEMINS DE FER FRANÇAIS, and CAISSE DES DÉPÔTS ET CONSIGNATIONS,

Defendants.

————————————

OPINION AND ORDER
December 19, 2008

————————————

RICHARD J. SULLIVAN, District Judge:

This action arises out of the expropriation of property from thousands of Jews and other "undesirables" during World War II as they were transported by rail to French holding camps, detained at those facilities, and ultimately deported to Nazi-run concentration camps. Plaintiffs are Holocaust survivors, as well as the heirs and beneficiaries of some Holocaust victims. They allege that, between August 1941 and July 1943, their money and property was confiscated while they were aboard trains operated by Defendant Société Nationale des Chemins de Fer Français

("SNCF") and held at camps run by civil servants of the Republic of France ("France"). They further allege that proceeds from those confiscations were deposited at Defendant Caisse des Dépôts et Consignations ("CDC").

Before the Court are Defendants' respective motions to dismiss. After careful consideration, the Court concludes that the bounds of its jurisdiction are not coterminous with the moral force of Plaintiffs' claims. For the reasons that follow, the Court finds that it lacks subject matter jurisdiction to adjudicate

Plaintiffs' claims under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* (the "FSIA" or the "Act"), and that, even if jurisdiction were proper, the case presents serious justiciability issues that make abstention appropriate. Accordingly, Defendants' motions to dismiss are granted.

## I. Background

### A. Facts[1]

During World War II, 75,000 Jews and thousands of other "undesirables" were taken captive and detained at holding camps in France. (Compl. ¶¶ 6-7.) SNCF transported the detainees by train between various French holding camps, and to Nazi-run concentration camps. (*Id.* ¶ 8.) When the detainees boarded the trains, SNCF employees demanded their money, suitcases, and valuables. (*Id.*) Upon arrival at the French holding camps, the detainees were forced to turn over any remaining money and property.[2] (*Id.* ¶ 7.)

Much of the confiscated property was ultimately deposited at CDC. (*Id.*) Some of the victims were searched again before the SNCF trains transported them to concentration camps. (*Id.*) In total, property was confiscated from approximately 56,400 people. (U.S. Dep't of Justice, Statement of Interest of the United States of America, June 29, 2006 ("Statement of Interest") at 3; Rakower Decl. Ex. B at 25.)

### 1. The Parties

Plaintiffs bring this action individually and on behalf of other Holocaust survivors and victims, their heirs, and beneficiaries. (Compl. ¶ 1.) The putative class includes all individuals detained in French holding camps, as well as those transported by SNCF trains either to those holding camps or to Nazi-run concentration camps. (*Id.* ¶ 51.) Plaintiffs are citizens of the United States, France, and other foreign nations. (*See id.* ¶¶ 10-11.)

Plaintiffs have named the Republic of France as a defendant in this action in its sovereign capacity as a "foreign state" under the FSIA, 28 U.S.C. § 1603(a). (*Id.* ¶ 24.)

Defendant CDC was created by an 1816 French statute in order to "restore faith in public finances following the Napoleonic Wars." (Rosenfeld Decl. ¶ 4.) It has been designated the "public depository of France" and is subject to the "oversight and guarantee of the French Legislature." (*Id.* ¶¶ 5-6.) During World War II, CDC accepted deposits of property taken from the detainees in the holding camps. (*See id.* ¶ 7 & Ex. D.) Today, the President of France appoints the CDC's Chairman and Chief Executive. (*Id.* ¶ 6.) The CDC also has a twelve-member Supervisory Board, including four members from the French Senate and French Chamber of Deputies. (*Id.*)

---

[1] The following facts are taken from the Complaint, declarations and affidavits submitted by the parties in connection with the instant motions to dismiss, and the Statement of Interest submitted by the United States Department of Justice. In the following analysis, the Court assumes the truth of Plaintiffs' allegations. Because the motions require the Court to assess the scope of its subject matter jurisdiction, the Court also relies on materials outside the pleadings submitted by all parties in connection with these motions. *See Land v. Dollar*, 330 U.S. 731, 735 & n.4 (1947); *Glencore Denrees Paris v. Dep't of Nat'l Store Branch 1*, No. 99 Civ. 8607 (RJS), 2008 WL 4298609, at *5 (Sept. 19, 2008) (citing *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998)).

[2] The Complaint defines "Property" as "any and all personal property, including cash, securities, silver, gold, jewelry, works of art, musical instruments, clothing, and equipment . . . ." (Compl. ¶ 2.) "Property also includes moneys earned from the sale of such Property." (*Id.*) The Court adopts Plaintiffs' definition of the term throughout this Opinion and Order.

Defendant SNCF was created in 1938, when the French government consolidated five regional train networks. (Compl. ¶ 25.) It is the national railway of France and is wholly owned by the French government. (*Id.*) SNCF is also one of the 500 largest companies in the world, and it derives substantial revenue from international business, including business conducted with United States citizens. (*Id.* ¶¶ 25, 61.)

## 2. The Drancy Holding Camp

Plaintiffs' claims center on property expropriations at French provincial holding camps such as Pithiviers, Beaune-la-Rolande, Compiègne, and Drancy. (*See id.* ¶ 10.) The Complaint focuses on the events in and around the camp at Drancy as Plaintiffs' starkest example of the atrocities that serve as the basis for their claims.

Over a six-day period starting on August 20, 1941, acting on orders from Nazi authorities, the Paris Police captured approximately four thousand Jews and brought them to a camp outside the city at Drancy. (*See* Rodd Decl. Ex. 6 at 14.) By March 1942, Drancy was being used as a "transit station" for deportation to Nazi concentration camps, mainly Auschwitz. (Compl. ¶ 10; Rodd Decl. Ex. 6 at 4, 14.) Between July and November 1942, approximately 29,000 victims were deported to Auschwitz, and an additional 8,000 people were sent between February 9 and March 25, 1943. (Rodd Decl. Ex. 6 at 4.) The Nazis took control of Drancy in July 1943 and used it as a concentration camp. (*Id.*)

Approximately 80,000 people "passed through" Drancy, including 40,000 Jews from outside of France. (Compl. ¶ 11.) About 67,000 of those victims were deported to Nazi-run concentration camps elsewhere in Europe. (Compl. ¶ 11; Rodd Decl. Ex. 6 at 14.) Less than 3% of these victims survived. (Compl. ¶ 6.)

Before the Nazis seized control of Drancy, it was run by French civil servants who kept records of the property that was seized from detainees. (Rodd Decl. Ex. 6 at 14.) The records from Drancy reflect that approximately 12,039,892 French francs were seized. (Compl. ¶ 15.)[3] Overall, an estimated 200,000,000 francs were expropriated from detainees at the French provincial camps. (*Id.* ¶ 14.)

The proceeds from the Drancy expropriations were initially deposited with the City of Paris Municipal Savings Bank, but, starting in February 1942, the money was brought directly to CDC. (Rodd Decl. Ex. 6 at 14.) At the end of World War II, 1,081,158.75 expropriated francs from Drancy had been returned. (*Id.* at 15.) However, as of December 1999, 9,733,308 expropriated francs remained deposited at CDC. (*See* Compl. ¶ 21.)

Limited amounts of the expropriated funds were reimbursed to 138 claimants in 1945 and 1946, but only twenty-five reimbursements were made after October 1947. (Rodd Decl. Ex. 6 at 15.) Physical property that was seized was returned on an even more limited basis. A series of auctions was held in the early 1950s, and the proceeds from the sales were deposited at CDC. (*Id.*)

---

[3]   All references to "francs" refer to French francs valued according to rates at the time they were allegedly expropriated. (*See* Compl. ¶ 15.)

3

Although CDC forfeited some of the spoliated funds to the French Treasury between 1978 and 1986, it also retained significant amounts of those funds. (*Id.*; Statement of Interest Ex. 1, Declaration of Stuart E. Eizenstat, Jan. 19, 2001 ("Eizenstat Decl.") ¶ 6)

### 3. The Mattéoli Mission And United States Diplomatic Efforts

In 1995, French President Jacques Chirac publicly declared that France would seek to remedy the harms done by the Vichy Regime and Nazi occupation. (Eizenstat Decl. ¶ 6.) Two years later, the French government initiated the Study Mission on the Spoliation of Jews in France (the "Mattéoli Mission"). (Statement of Interest at 3.) The Mattéoli Mission issued a 3,000 page report in April 2000, which described various types of spoliations suffered by Jews in France between 1940 and 1944 (the "Mattéoli Report"). (Eizenstat Decl. ¶ 6.)

The Mattéoli Report quantified, to some extent, past restitution for the French expropriations, but found that "significant portions of the spoliated bank assets remain[] unknown." (*Id.*) It recommended, *inter alia*, creating a commission to hear claims relating to lost property, and establishing a foundation that would provide support to Holocaust victims and their families, as well as education regarding the Holocaust. (*Id.* ¶ 7.)

While the Mattéoli Mission was conducting its inquiry, individual Holocaust victims began filing claims in United States courts relating to the expropriations in France. (*Id.* ¶ 8.) In August 2000, just months after the Mattéoli Report had been released, "a United States District Court denied a motion to dismiss two of the cases, indicating that they would be allowed to proceed." (*Id.*)

As the Mattéoli Mission was working in France and the American lawsuits against French banks proceeded, the United States government sought to facilitate an alternative resolution of the Holocaust survivors' claims. Between the fall of 1998 and the summer of 2000, Stuart E. Eizenstat, serving as the Secretary of State's Special Envoy on Property Restitution in Central and Eastern Europe, led a team of United States officials seeking to "facilitate[] negotiations leading to a resolution of class action lawsuits filed in [United States] courts against German companies arising from slave and forced labor and other wrongs by those companies during the Nazi era." (Statement of Interest at 4; *see also* Eizenstat Decl. ¶ 1.)

Eizenstat was experienced with the task at hand. He had led a team with a similar mission in Austria, which resulted in the October 2000 creation of an Austrian foundation and a general settlement fund to compensate those who were victimized within the Austrian territory during World War II. (Eizenstat Decl. ¶ 10.) Eizenstat was also involved in the creation of a German Foundation known as "Remembrance, Responsibility, and the Future," which makes payments to victims who were forced to work for German companies during the Nazi era. (*See* Statement of Interest at 4-5; Eizenstat Decl. ¶ 10.)

Meanwhile, as a result of the Mattéoli Report, France established the Commission for the Compensation of the Victims of Acts of Despoilment Committed Pursuant to Anti-Semitic Laws in Force During the Occupation (the "CIVS" or the "Commission") in

September 1999. (Eizenstat Decl. ¶ 7.) In December 2000, the Foundation for Memory of the Shoah ("Foundation" or the "Shoah Foundation") was established. (*Id.*) In light of Eizenstat's progress with the Austrian and German settlements, parties to similar discussions in France requested his assistance in resolving litigation against French banks. (*Id.* ¶ 11.)

4. The Joint Statement And The Executive Agreement

Beginning in November 2000, Eizenstat represented the United States at negotiations between the French government, French banks, and attorneys representing Holocaust victims with claims against the banks. (*Id.* ¶ 12.) The claimants' representatives were concerned that the CIVS and the Shoah Foundation would not provide enough compensation to the victims. (*Id.* ¶ 14.) They were also concerned that some victims would not be compensated because they could not substantiate their losses. (*Id.*)

A major breakthrough in the negotiations occurred in January 2001, when the participating banks agreed to establish a fund that would make payments to victims who lacked documentation for their claims before the CIVS (the "Fund"). (*Id.* ¶ 15.) The participating banks agreed to contribute $22.5 million to the Fund in exchange for the dismissal with prejudice of all cases pending against the banks as of January 18, 2001. (Statement of Interest Ex. 1A at 1-2; *see also* Eizenstat Decl. ¶ 15.) The banks' contributions to the Fund were deposited at CDC. (*See* Statement of Interest Ex. 1A Annex A at 2.) The parties agreed that the CIVS would refer cases to the Fund for compensation when the CIVS process was unable to verify the victims' losses through its own procedures. (*Id.* Annex A at 2-3.)

The parties to the negotiations memorialized this agreement in a January 18, 2001 Joint Statement, which was signed in Washington, D.C. (*See* Statement of Interest Ex. 1A ("Joint Statement").) The signatories included representatives of France and the United States, a French banking association known as Association Francaise des Éstablissements de Crédit et des Entreprises d'Investissement ("AFECEI"), and several attorneys representing victims' interests, including Plaintiffs' counsel, Harriet Tamen. (*See id.* at 3-4.)

Because the parties to the Joint Statement agreed to dismiss pending expropriation claims against French "banks," the term "bank" took on central significance during the negotiations. The Joint Statement defined the term to include (1) "[t]he defendants in the actions *Benisti, et al. v. Banque Paribas, et al.*, No. 98 Civ. 7851 (E.D.N.Y.); *Bodner, et al. v. Banque Paribas, et al.*, No. 97 Civ. 7433 (E.D.N.Y.); and *Mayer v. Banque Paribas, et al.*, Civ. Action No. 302226 (Cal. Superior Court)"; (2) members of the AFECEI; and (3) "other financial institutions that receive deposits." (*Id.* Annex B.) The definition excluded insurance companies, and it prohibited challenges to settlements regarding these claims with Barclays Bank and JP Morgan that predated the agreement between the parties to the Joint Statement. (*Id.*) Finally, the Joint Statement noted, "[w]ith respect to banks of French nationality, this definition applies to all World War II activities of such banks." (*Id.*)

The Joint Statement referenced an Executive Agreement between the United

States and France, which was executed on the same day as the Joint Statement. (*See* Statement of Interest Ex. 1B ("Executive Agreement").)[4]  Through the Agreement, the two nations stated that "it is in the interests of both the [United States and France] to have a resolution of these issues that is non-adversarial and non-confrontational, and outside of litigation," and that "both parties desire all-embracing and enduring legal peace with respect to all claims asserted against the Banks arising out of World War II . . . ." (*Id.* at 3.)  To further those goals, France undertook to enforce the banks' promised contributions to the Fund, and to provide legal oversight of the CIVS and the Foundation in connection with the parties' agreement. (*Id.* at 4.) The United States promised:

> in all pending and future cases [to] . . . inform its courts through a Statement of Interest . . . that it would be in the foreign policy interests of the United States for the Commission, the Foundation, and the Fund to be the exclusive remedies and fora for resolving . . . claims asserted against the Banks and that dismissal of such

---

[4]   The Joint Statement described the Executive Agreement as follows:

> France and the United States will sign an Executive Agreement.  Such Agreement contains the obligation undertaken by the United States to assist in achieving all-embracing and enduring legal peace for the Banks for all claims that have been or may be asserted against such banks arising out of World War II.

(Joint Statement at 2.)  The Executive Agreement adopted in full the Joint Statement's definition of "Bank."  (*See* Executive Agreement Annex A.)

cases would be in its foreign policy interest.

(*Id.* at 5.)  As characterized by Eizenstat,

> [t]he Executive Agreement negotiated is not a government-to-government claims settlement agreement, and the United States has not extinguished the claims of its nationals or anyone else. Instead, the intent of our participation was . . . to bring expeditious justice to the widest possible population of survivors, and to help facilitate legal peace.  Among these parties, the United States facilitated the essential arrangement by which the French side would establish the Fund, and make certain enhancements to the [CIVS] and [Shoah] Foundation . . . , and the class action representatives in pending United States litigation agreed to give up their claims.  The [United States] further contributed its own commitment to advise United States courts of its foreign policy interests . . . in current and future litigation being dismissed.

(Eizenstat Decl. ¶ 17.)

### 5.  The French Alternative Fora: The CIVS, The Fund, And The Shoah Foundation

The CIVS initially focused on publicizing the availability of its compensation mechanism. (*See id.* ¶ 19.)  It did so by contacting Holocaust victims organizations, as well as by establishing outreach offices in the United States and other countries to obviate the need for victims and their heirs to travel to France to file claims. (Statement of Interest at 8; Eizenstat Decl. ¶¶ 18-24.)

Claimants may appear in the CIVS through representatives and do not have to attend the proceedings. (Eizenstat Decl. ¶ 20.) CIVS also employs a "relaxed standard of proof" relative to United States courts. (*Id.*) As part of its process, individual CIVS panels aim to award an "amount designed to compensate fully the claimants for any material damages" suffered from their assets being expropriated. (*Id.*)

There is no cap on compensation awards, and the participating banks committed to paying the full amount recommended by the Commission to each successful claimant. (*Id.* ¶ 21.) The CIVS issues periodic reports of its activity as well as the criteria on which its decisions are based. (*Id.* ¶ 23; Rakower Decl. ¶ 5.) There is also an appeals process through which claimants may appeal panel decisions to the full Commission. Decisions of the full Commission are also subject to reconsideration based on new facts or previous errors. (Eizenstat Decl. ¶ 22.)

Individuals "whose claims cannot be substantiated by the" CIVS are referred to the Fund. (*Id.* ¶ 24.) The Fund is administered by a five-person board comprised of two members appointed by France, two members appointed by the United States, and one member appointed by the attorneys who represented the victims in the negotiation of the Joint Statement. (*See* Joint Statement Annex B at 3.) Each referred claimant receives a $1,500 lump sum payment from the Fund, and, in February 2005, the Fund agreed to make a second round of supplemental payments to some of those who had already received compensation from it. (*See* Larrivet Decl. ¶ 34.)

The third component of the French efforts to redress these expropriations is the Shoah Foundation, which was established by decree of the French Government in December 2000. (Eizenstat Decl. ¶ 7.) It was designed "as the primary mechanism to achieve full disgorgement by French banks and other French institutions of any remaining assets that were not subject to restitution." (*Id.* ¶ 25.) The Foundation's objectives include research and education regarding the Holocaust and Holocaust victims, as well as studying other acts of genocide and crimes against humanity. (*Id.* ¶ 26.) It also provides funding for "moral, technical, and financial support" to victims and their families. (*Id.* ¶ 26.) The Foundation was initially endowed with approximately $375 million, approximately $100 million of which was contributed by French banks. (*Id.* ¶ 25.)

### B. Procedural History

#### 1. Plaintiffs' Lawsuit

Plaintiffs commenced this action on March 2, 2006 by filing a complaint on behalf of themselves and all others similarly situated against France, SNCF, and CDC. They bring claims for conversion and unjust enrichment, they seek an accounting of the allegedly expropriated property, and they also contend that they are entitled to compensatory and punitive damages based on Defendants' alleged violations of international law.

Defendants have not answered, and instead filed the instant motions to dismiss on December 1, 2006. The case was reassigned to the undersigned on October 14, 2007. The Court held oral argument on June 3, 2008.

## 2. The United States Statement of Interest

On July 12, 2006, the Department of Justice submitted to the Court a document titled "Statement Of Interest Of The United States Of America" (the "Statement of Interest"). The background information contained in the Statement of Interest is drawn from the Eizenstat Declaration, the Joint Statement, and the related Executive Agreement, all of which are attached to the Statement of Interest as exhibits. (*See* Statement of Interest Exs. 1, 1A, 1B.)

The Statement of Interest is expressly limited to Plaintiffs' claims against CDC. (*See* Statement of Interest at 2 n.2.) It states that "[t]he United States has determined that the CDC is a 'bank' as that term is used in the Executive Agreement, and that plaintiffs' claims against the CDC are thus covered by the Agreement." (*Id.* at 11.) After outlining the interests of the United States in providing compensation to Holocaust survivors, furthering close diplomatic cooperation with France, and avoiding conflicts between Holocaust victims organizations and banks, the Statement of Interest asserts that:

> The United States does not suggest that these policy interests described above in themselves provide an independent legal basis for dismissal. . . . Because of the United States' strong interests in the success of the CIVS, the Foundation, and the Fund, however, the United States recommends dismissal on any valid legal ground.

(*Id.* at 14.)

## II. THE SEQUENCE OF THE COURT'S ANALYSIS

Although Defendants filed separate motions, their principal arguments are similar. Each Defendant argues, albeit for different reasons, that: (1) it is immune from Plaintiffs' claims under the FSIA; (2) the act of state doctrine and *forum non conveniens* require dismissal; (3) the statute of limitations bars Plaintiffs' claims; (4) abstention is appropriate based on the political question doctrine and principles of international comity; and (5) Plaintiffs did not effectuate valid service of process.

In considering Defendants' motions, the Court is mindful that it must "address questions pertaining to its . . . jurisdiction before proceeding to the merits." *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94-95 (1998)); *see also Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."); *Alliance for Envtl. Review, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85-88 (2d Cir. 2006). Thus, because the act of state doctrine is substantive rather than jurisdictional, *see W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 408-10 (1990), courts may not consider its application prior to establishing that subject matter jurisdiction exists, *see In re Papandreou*, 139 F.3d 247, 256 (D.C. Cir. 1998). Similarly, the Court may not — and in light of its holding, does not — reach Defendants' statute of limitations arguments before resolving the questions regarding jurisdiction and justiciability. *See Bowles v. Russell*, 127 S. Ct. 2360, 2369 (2007) ("[A]

statute of limitations . . . provides an affirmative defense . . . and is not jurisdictional . . . .") (internal citations omitted).

These principles, however, do not prescribe a "sequencing" for Defendants' remaining arguments. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999). Courts have discretion to decide motions on *forum non conveniens* grounds before deciding whether subject matter jurisdiction exists. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1192 (2007). Courts may also, under some circumstances, resolve justiciability issues before deciding whether jurisdiction is proper. *See Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 73 n.18 (2d Cir. 2005); *Can v. United States*, 14 F.3d 160, 162 n.1 (2d Cir. 1994) ("[J]usticiability is also a 'threshold' question.").

Based on these principles, the Court first addresses whether its has subject matter jurisdiction to decide Plaintiffs' claims. For the reasons set forth in Part III of this Opinion and Order, the Complaint is dismissed because Defendants are entitled to sovereign immunity under the FSIA. Additionally, for the reasons stated in Part IV, even if the Court had subject matter jurisdiction, the Court would abstain, based on the political question doctrine and principles of international comity, from deciding the claims of those Plaintiffs who are eligible to seek compensation from the CIVS and the Fund. Finally, in light of these holdings, the Court does not reach Defendants' remaining arguments based on *forum non coveniens*, the act of state doctrine, and the statute of limitations.

## III. THE FOREIGN SOVEREIGN IMMUNITIES ACT

France, CDC, and SNCF argue that the FSIA grants them sovereign immunity and that, therefore, they are not subject to liability for Plaintiffs' claims in United States courts. Plaintiffs argue that the Court has subject matter jurisdiction because each Defendant fits within the "takings exception" to the FSIA based on the alleged property expropriations in violation of international law. For the reasons that follow, Plaintiffs' claims against each Defendant are dismissed for lack of subject matter jurisdiction.[5]

### A. Law

"[T]he FSIA was enacted to address 'the potential sensitivity of actions against foreign states.' . . . [I]t aimed 'to facilitate and depoliticize litigation against foreign states and to minimize irritations in foreign relations arising out of such litigation.'" *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (quoting H.R. Rep. No. 1487, at 45 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6631, 6634). The FSIA, therefore, "provides the sole basis for obtaining jurisdiction over a foreign state in

---

[5]    Plaintiffs also allege that the Court has subject matter jurisdiction under the federal question statute, 28 U.S.C. § 1331 (Compl. ¶ 56), the Alien Tort Claims Act, 28 U.S.C. § 1350 (*id.* ¶ 58), the supplemental jurisdiction statute, 28 U.S.C. § 1367 (*id.* ¶ 59), and "general principles of supplemental jurisdiction" (*id.*). These allegations are insufficient to establish jurisdiction. The FSIA is the "sole basis" for asserting subject matter jurisdiction over "foreign states," a phrase that includes the sovereign's political subdivisions, agents, and instrumentalities. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Therefore, subject matter jurisdiction exists if, and only if, it is proper under the FSIA.

federal court," *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989), and it applies to the instant case despite the fact that the alleged conduct occurred prior to its enactment, *see Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004).

Under the Act, "foreign state[s]" are presumptively immune from suit in United States courts unless one of the statute's exceptions apply. *See Garb v. Republic of Poland*, 440 F.3d 579, 582 (2d Cir. 2006) (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)). The only exception at issue here is the FSIA's "takings" exception, 28 U.S.C. § 1605(a)(3), which denies "foreign states" sovereign immunity for certain types of claims relating to expropriations of property in violation of international law.

### 1. Motion to Dismiss Standard

In a motion to dismiss on FSIA grounds, the movant must first make a *prima facie* showing that it is a "foreign state" under the Act. *See Cabiri v. Republic of China*, 165 F.3d 193, 196 (2d Cir. 1999). "This proof establishes a presumption that immunity applies." *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 293-94 (S.D.N.Y. 1987). Once the movant makes that showing, the opposing party "has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Cabiri*, 165 F.3d at 196 (quoting *Cargill*, 991 F.2d at 1016. However, "the ultimate burden of persuasion remains with the alleged foreign sovereign." *Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008) (internal citation omitted).

In considering such a motion, the "district court 'retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). This discretion includes the ability to "'resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits.'" *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998) (quoting *Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991)); *see also Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) ("On a . . . motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits . . . .").

### 2. The FSIA's "Takings" Exception

For the purposes of the FSIA, a "foreign state" includes a foreign state's political subdivisions, agencies, and instrumentalities. *See* 28 U.S.C. § 1603(a). The statute further defines "agency or instrumentality of a foreign state" to include entities that are (1) "separate legal person[s]," (2) "organ[s] of a foreign state or political subdivision[s] thereof," and (3) neither United States citizens nor organized under the laws of a third country. *Id.* § 1603(b). When determining immunity under the FSIA, the court looks to the entity's form at the time the complaint was filed, not the time of the alleged wrongdoing. *See Abrams v. Société Nationale des Chemins de Fer Français*, 389 F.3d 61, 64 (2d Cir. 2004) (citing *Altmann*, 541 U.S. at 696).

10

The "takings" exception to the FSIA, *see* 28 U.S.C. § 1605(a)(3), was interpreted by the Second Circuit in *Garb v. Republic of Poland*, 440 F.3d at 588.  It held that:

> To establish subject matter jurisdiction [over a "foreign state"] pursuant to the "takings" exception of the FSIA, a plaintiff must demonstrate each of four elements:
>
> (1) that rights in property are at issue;
>
> (2) that the property was "taken";
>
> (3) that the taking was in violation of international law; *and either*
>
> (4)(a) "that property . . . is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," *or*
>
> (4)(b) "that property . . . is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]"

*Id.* (citing 28 U.S.C. § 1605(a)(3) and *Zappia*, 215 F.3d at 251) (emphasis in original).  As the *Garb* court's emphasis makes clear, there are four elements to the "takings" exception and the fourth element has two disjunctive prongs, which the Court refers to below as "4(a)" and "4(b)." *Id.*

The term "taken" is not defined in the FSIA, but "the legislative history makes clear that the phrase 'taken in violation of international law' refers to 'the nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law,' including 'takings which are arbitrary or discriminatory in nature.'" *Zappia*, 215 F.3d at 251 (quoting H.R. Rep. No. 94-1487, at 19).  Thus, the "taking" must be done by a sovereign — not a private entity — in a manner that "deprive[s] a plaintiff of property without adequate compensation." *Id.* (citing *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 685 (1976)).

To prove that the applicability of the "takings" exception precludes immunity for a "foreign state," Plaintiffs may show that either one of the disjunctive prongs of the fourth element is satisfied.  The first prong, 4(a), "sets a higher threshold of proof for suing sovereign states in connection with alleged takings by requiring that the property at issue be 'present in the United States.'" *Garb*, 440 F.3d at 589 (quoting 28 U.S.C. § 1605(a)(3)).  In order to establish that the requirements of the second prong, 4(b), are met, Plaintiffs must show that: (1) the expropriated property, or funds derived therefrom, is currently owned or operated by an agency or instrumentality of the foreign state; and (2) the agency or instrumentality in question is engaged in a commercial activity in the United States.  *See* 28 U.S.C. § 1605(a)(3).

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d).  "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."

*Id.* The Act's legislative history suggests that the commercial activity need not take place entirely in the United States. *See* H.R. Rep. No. 94-1498, at 17. Moreover, the text of the second prong of the fourth element does not require that the commercial activity be connected to the actions resulting in the expropriation. *See* 28 U.S.C. § 1605(a)(3).

Finally, "agencies and instrumentalities of foreign governments are entitled to a presumption of independent status that can be overcome only where 'internationally recognized equitable principles' require disregarding the corporate form in order to avoid injustice." *Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250, 253 (S.D.N.Y. 1993) (quoting *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 626, 633 (1983)). This "presumption of separateness" prevents the "takings" exception from being used to exert jurisdiction over "foreign states" on the basis of conduct by entities with separate juridical status:

> Freely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee. As a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated.

*Bancec*, 462 U.S. at 626. "While the presumption of separateness is a strong one, it may be overcome if a corporate entity is so extensively controlled by the sovereign that the latter is effectively the agent of the former, or if recognizing the corporate entity as independent would work a fraud or injustice." *Zappia*, 215 F.3d at 252.

### B. Analysis

The Court concludes at the outset that France is a "foreign state" under the FSIA (Compl. ¶ 24), and that both CDC and SNCF are "agencies or instrumentalities" of France under 28 U.S.C. § 1603(a). (*See* Compl. ¶ 25 ("SNCF is the national railway of France and . . . . wholly owned by the French government."); *id.* ¶ 9 ("CDC [is] the national public depository of France . . . ."); *see also* Transcript of Oral Argument on June 3, 2008 ("Tr.") at 70 ("[Plaintiffs] agree that the CDC and the SNCF are agencies or instrumentalities . . . .").) Defendants have therefore made the required *prima facie* showing that the FSIA applies and that they are presumptively immune from suit. In order to show that the Court has subject matter jurisdiction to hear their claims, Plaintiffs must demonstrate that one of the exceptions to immunity under the Act applies to each Defendant.

Plaintiffs' arguments focus exclusively on the "takings" exception to the FSIA. *See* 28 U.S.C. § 1605(a)(3). In order to focus the analysis, the Court assumes, without deciding, that Plaintiffs have satisfied the first, second, and third elements of this exception. *See Garb*, 440 F.3d at 588-89 (making similar assumptions); *see also Russian Federation*, 528 F.3d at 940 (characterizing the first three elements as

jurisdictional and suggesting that they may be satisfied by the plaintiff's allegations so long as not "wholly insubstantial and frivolous" (citing *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)). Specifically, the Court assumes that: Plaintiffs' claims involve rights in tangible property (*see* Compl. ¶ 2); that expropriations occurred (*see id.* ¶¶ 12-13, 18); and that at least some of the alleged expropriations violated international law (*see id.* ¶¶ 10-11, 67-71).[6] Consequently, the Court focuses its analysis on prongs 4(a) and 4(b) of the fourth element of 28 U.S.C. § 1605(a)(3). *See Russian Federation*, 528 F.3d at 941 (holding that the fourth element "must . . . be resolved in the plaintiff's favor before the suit can proceed").

For the reasons stated below with respect to each Defendant, Plaintiffs have not demonstrated that the "takings" exception

---

[6]   Plaintiffs allege that Defendants victimized citizens of a number of nations, as opposed to just French citizens, within France's borders. (*See* Compl. ¶ 10 ("Jews of all nationalities were herded into the holding camp at Drancy . . . ."); *id.* ¶ 11 ("60,000 deportees came from the provincial camps; those included more than 40,000 Jews of foreign origin, including Jews from Belgium and Holland.").) In light of these allegations, the Court need not resolve the difficult question — reserved by the Second Circuit in *Garb* — of "whether the right to be free from the discriminatory and uncompensated taking of property was one of the 'fundamental rights' conferred by international law 'upon all people vis-a-vis *their own governments*.'" *Garb*, 440 F.3d at 589 (quoting district court) (emphasis in original).

Further, in light of the Court's holding, and because the Court assumes that violations of international law occurred, it is unnecessary to reach Defendants' argument that Plaintiffs cannot establish this element of the "takings" exception without first "exhausting administrative remedies" by seeking compensation in France. (*See, e.g.*, France Mem. at 8.)

applies. The Court finds the present record sufficient to apply the FSIA, and Plaintiffs have not shown that jurisdictional discovery would aid the Court's determination. Accordingly, Plaintiffs' request for discovery is denied and Defendants are entitled to sovereign immunity under the FSIA.

### 1. CDC

Plaintiffs do not allege that, under prong 4(a), the allegedly expropriated property is "present in the United States." 28 U.S.C. § 1605(a)(3). Thus, in order to establish that CDC is within the Court's subject matter jurisdiction under the "takings" exception, Plaintiffs must show, under prong 4(b), that: (1) expropriated "property or any property exchanged for such property is owned or operated" by CDC, and (2) that CDC "is engaged in a commercial activity in the United States." *Id.*

Plaintiffs' primary argument is that CDC is "engaged in a commercial activity in the United States" due to the conduct of its subsidiaries. (*See* Pls.' Opp'n at 19-21.) CDC responds that "an indirect ownership interest cannot be used to confer jurisdiction . . . ." (CDC Mem. at 16.) The Court finds that CDC is entitled to sovereign immunity under the FSIA because it is not "engaged in a commercial activity" based on the actions of the distant subsidiaries Plaintiffs describe.

The FSIA defines "commercial activity" to include either "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The verb "engaged," which precedes this phrase in the statute, *id.* § 1605(a)(3), suggests a requirement of an affirmative decision by the entity in question

— CDC — to conduct such activity. *See Webster's Third New Int'l Dictionary* 751 (2002) (defining "engage" as "to begin and carry on an enterprise, esp[ecially] a business or profession"). Even if, as Plaintiffs argue, the threshold of commercial activity required to satisfy the "engaged in" requirement is low (*see* Pls.' Opp'n at 19-21), the language of the statute necessitates, at least, an affirmative decision by the "agency or instrumentality" to perform a commercial transaction or act.[7] Plaintiffs point to no such direct acts or decisions by CDC.

Instead, Plaintiffs' allegations focus on the acts of CDC's subsidiaries. (*See* Pls.' Opp'n at 20.) Plaintiffs argue that the website of a CDC subsidiary, Egis Groupe, "describes work done by its Egis Semaly division on the New York City subway system and lists a New York business office address for that division." (*Id.*) The screenshots of the website provided by Plaintiffs, however, reference CDC only once, simply noting that Egis Groupe is a subsidiary. (*See* Rodd Decl. Ex. 7B at 4.) Similarly, Plaintiffs note that CDC subsidiary VVF Vacances "lists vacation properties . . . on U.S. based websites and offers to mail its brochures to interested potential customers in the U.S." (*See* Pls.'

Opp'n at 20.) Again, however, the website cited by Plaintiffs does not mention CDC. The Court cannot simply disregard the corporate form of these entities and impute their actions to CDC. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 473 (2003).

To support its position, CDC has proffered evidence that it does not have direct relationships with these subsidiaries and that they are removed by multiple intermediaries. (*See* Ritz Decl. ¶¶ 13-15; Ritz Reply Decl. ¶¶ 4-6.) For example, Plaintiffs allege that CDC is engaged in a commercial activity in the United States on the basis of the activities of "CDC Capital, Inc." (Pls.' Opp'n at 19-20.) According to the declaration of Olivier Ritz, CDC owns a minority stake in Caisse Nationale des Caisses d'Epargne ("CNCE"), which is controlled by a different entity known as Caisses d'Epargne. Caisses d'Epargne is unaffiliated with CDC. CNCE controls IXIS Corporate & Investment Bank, which controls IXIS North America Inc., which, in turn, controls IXIS Capital Markets North America Inc., formerly "CDC Capital, Inc." (*See* Ritz Decl. Ex. A.) Thus, CDC is removed from the entity to which Plaintiffs point — the former CDC Capital, Inc. — by three organizational layers. (*Id.*) It cannot control the business decisions through its 35% ownership interest in CNCE. On the basis of these facts, CDC cannot be said to be "engaged" in commercial activity based on the conduct of that subsidiary.

Plaintiffs' argument regarding Egis Semaly, Inc. is subject to similar deficiencies. (Pls.' Opp'n at 20.) Egis Semaly, Inc. is a fully owned subsidiary of a French company known as Semaly. (Ritz Reply Decl. ¶ 5.) Another French company, Egis Ingénierie, owns 82.55% of Semaly. (*Id.*) Egis

---

[7]   The legislative history of the Act supports this conclusion. Congress provided courts with "a great deal of latitude in determining what is a 'commercial activity' for purposes of [the FSIA]." H.R. Rep. No. 94-1487, at 16. The Committee Report's examples of "particular transaction[s] or act[s]" constituting "commercial activity" involve affirmative acts, such as entering into contracts, selling goods, leasing property, borrowing money, or hiring employees and agents. *Id.* All of the examples involve more than passive ownership in removed subsidiaries. More importantly, they suggest that the Court is to look to the allegations of acts taken, as well as decisions made, by CDC rather than acts of its distantly related affiliates.

Ingénierie is fully owned by Egis SA, and, finally, CDC owns Egis SA. (*Id.*) Thus, CDC is removed from Egis Semaly by four levels of subsidiaries. Plaintiffs have not alleged that CDC has abused the corporate form through the structuring of these entities. *See Em Ltd. v. Republic of Argentina*, 473 F.3d 463, 477 (2d Cir. 2007) (citing *Bancec*, 462 U.S. at 611). Accordingly, for reasons discussed in more detail below, the Court declines to equate the conduct of Egis Semaly with the actions of CDC, a separate entity.

Plaintiffs' last contention is that a CDC subsidiary known as VVF Vacances solicits business from United States citizens. (Pls.' Opp'n at 20.) CDC possesses only a 40% interest in VVF Vacances, however, and the relationship is maintained through an intermediate subsidiary. (*See* Ritz Reply Decl. ¶ 6.) Thus, based on the record before the Court, CDC could neither direct VVF Vacances to "engage in commercial activity" on its behalf nor order it to refrain from doing so. Moreover, Plaintiffs do not allege that the proceeds from VVF Vacances' solicitations or transactions inure in any way to CDC. As such, CDC is not "engaged in a commercial activity in the United States" on the basis of this relationship.

In addition to failing to satisfy the plain meaning of the statutory definition, Plaintiffs' arguments based on these subsidiaries' conduct are also contrary to the case law interpreting the statute. The principles arising out of *Bancec* and *Patrickson* demonstrate that "[corporate] structure often matters" when assessing jurisdiction over entities under the FSIA. *Patrickson*, 538 U.S. at 473. The *Bancec* Court established a presumption that a government's instrumentalities are separate from the sovereign. *See Bancec*, 462 U.S. at 626. Applying the law of private corporations, the Supreme Court noted that recognizing juridical independence was less appropriate where one corporate entity "extensively controlled" its agent. *Id.* at 629. In support of its reasoning, the Supreme Court quoted the House Committee Report accompanying the FSIA: "If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between . . . a U.S. corporation and its independent subsidiary." *Id.* at 628 (quoting H.R. Rep. No. 94-1487, at 29-30). Just so here. Declining to recognize CDC's sovereign immunity based on its limited and largely indirect holdings in other entities would disregard the distinction between CDC and its independent subsidiaries. Doing so would encourage foreign courts to do the same when assessing the conduct of United States corporations.

*Patrickson* provides additional support for the Court's conclusion. There, the Supreme Court affirmed a court of appeal's holding that "a subsidiary of an instrumentality is not itself entitled to instrumentality status." *Patrickson*, 538 U.S. at 473. The Court noted that the foreign sovereign "did not have direct ownership of shares in either of the [defendant] Companies at any time pertinent to [the] suit. Rather, these companies were, at various times, separated from the State of Israel by one or more intermediate corporate tiers." *Id.* The Court found

> no authority for extending the doctrine [of piercing the corporate veil] so far that, as a categorical matter, all subsidiaries are deemed to be the same as the parent corporation. The

> text of the FSIA gives no
> indication that Congress intended
> us to depart from the general rules
> regarding corporate formalities.

*Id.* at 475-76.  Based on *Patrickson* and the ownership structure of these organizations, this Court cannot conclude that CDC's ownership in the subsidiaries to which Plaintiffs point is sufficient to deem CDC accountable for those subsidiaries' activities and therefore subject to suit in the United States.

Finally, courts in this District have applied the presumption of separateness established in *Bancec* when making jurisdictional determinations under the FSIA. *See U.S. Fidelity and Guar. Co. v. Braspetro Oil Servs. Co.*, No. 97 Civ. 6124 (JGK), 1999 WL 307666, at *7 n.15 (S.D.N.Y. May 17, 1999); *Gabay v. Mostazafan Found. of Iran* ("*Gabay II*"), 968 F. Supp. 895, 898 (S.D.N.Y. 1997); *Gabay v. Mostazafan Found. of Iran* ("*Gabay I*"), 151 F.R.D. 250, 253-54 (S.D.N.Y. 1993); *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 253 (S.D.N.Y. 1987).  In *Gabay I*, a United States citizen brought an expropriation claim against two defendants, an Iranian Foundation acting as an instrumentality of Iran (the "Iranian Foundation") and a foundation organized under New York law (the "New York Foundation").  *Gabay I*, 151 F.R.D. at 251-52.  The plaintiff alleged that the FSIA's "takings" exception applied to the Iranian Foundation, and the primary issue before the court was whether "the Iranian foundation *is* engaged in a commercial activity in the United States through the New York Foundation, its alleged 'alter ego'" *Id.* at 253 (emphasis in original).

The *Gabay I* court found that the presumption of separateness was applicable to the jurisdictional issue, holding that "[u]nder *Bancec* and its progeny . . . plaintiff has the burden of overcoming the presumption of independence on the part of defendant foundations."  *Id.* at 253 (citations omitted).  The court also noted that the Iranian Foundation's entitlement to the presumption of separateness hinged on the applicability of two exceptions articulated by the *Bancec* Court:  (1) extensive control resulting in an alter-ego relationship, and (2) potential "'fraud or injustice'" arising from recognizing the entities as separate.  *Id.* (quoting *Bancec*, 462 U.S. at 629).  Because the plaintiff had presented evidence that the Iranian Foundation had "taken over" the New York Foundation and "closely controlled" it, as well as that the Foundations had commingled funds, the court granted limited jurisdictional discovery into the relationship between the two foundations.  *Id.* at 257-58.

After the discovery was completed, the plaintiff's action was dismissed.  *See Gabay II*, 968 F. Supp. at 900.  With respect to the applicability of *Bancec*, the court noted that "[e]ven if Judge Wood's analysis were not the law of the case . . . , this Court would adhere to it."  *Id.* at 899.  Applying the presumption of separateness, the Court dismissed the plaintiff's claims because "the Iran Foundation did not exercise day-to-day control over the New York Foundation . . . ."  *Id.* at 899.

The *Gabay* cases suggests that CDC should be presumed to be separate from the subsidiaries at issue.  Unlike in *Gabay I*, where the court found that discovery was appropriate, Plaintiffs offer no evidence that CDC controlled any of these entities in a

manner that would give rise to an agency relationship under the FSIA. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 448 (2d Cir. 1990) ("Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA."). Indeed, Plaintiffs have not argued that the subsidiaries are alter-egos of CDC, or that recognizing CDC's separateness from these subsidiaries would result in a "fraud or injustice." In the absence of arguments to the contrary, the Court finds the reasoning of *Gabay I* and *Gabay II* persuasive. CDC is entitled to a presumption that it is separate from its far-removed subsidiaries for the purposes of this jurisdictional analysis.

Rather than addressing CDC's presumption argument, Plaintiffs contend, in their Sur-Reply, that "[t]he subsidiaries' activities, which the CDC touts in its public reports but seeks to disavow in this proceeding, demonstrate that CDC engages in commercial activity in the United States sufficient to satisfy the FSIA taking[s] exception." (Pls.' Sur-Reply at 7.) This contention is unsupported by the record — the "public report" cited by Plaintiffs is that of Egis Groupe, not CDC. (Rodd Decl. Ex. 7B.) Plaintiffs' citation to CDC's website simply lists CDC's subsidiaries without elaboration. (*Id.* Ex. 7A.)

Therefore, the Court finds that Plaintiffs' argument is inconsistent with the plain meaning of the statutory definition of "commercial activity," as well as the case law interpreting the "takings" exception. Plaintiffs have not demonstrated that CDC is "engaged in a commercial activity in the United States." As such, CDC is entitled to sovereign immunity.

## 2. SNCF

Although Plaintiffs have sufficiently alleged that SNCF is engaged in commercial activity in the United States (*see* Compl. ¶ 61), they have failed to allege that either the expropriated property, or "property exchanged for such property," "is owned or operated" by SNCF. Rather, the Complaint simply alleges that SNCF "took" the property. (Compl. ¶ 18; *see also id.* ¶¶ 27, 29, 30, 31, 33, 34, 35, 38, 39, 41, 42, 43, 45, 46, 54.) In their Memorandum of Law, Plaintiffs argue that "SNCF took property from them and the property was not returned." (Pls.' Opp'n at 21-22.) The Court has assumed that these allegations satisfy the second element of the "takings" exception, "that property was 'taken.'" *Garb*, 440 F.3d at 588 (quoting 28 U.S.C. § 1605(a)(3)). However, based on these assertions, and without a proffer of extrinsic evidence, Plaintiffs argue that the expropriated property should be considered to be "owned or operated" by SNCF because it was never returned to its owners and restitution has not been made. (Pls.' Opp'n at 21-22; *see also* Tr. at 76.)

Plaintiffs' argument requires the Court to infer from their allegations that property that was allegedly taken over sixty years ago is presently owned or operated by SNCF. (*See, e.g.*, Compl. ¶ 27 ("SNCF and French government officials participated in such confiscation."); *id.* ¶ 34 ("SNCF was involved in the taking of his property.").) These allegations and arguments with respect to the "owned or operated" component of prong 4(b) are insufficient to satisfy Plaintiffs' "burden of going forward with evidence

showing that, under exceptions to the FSIA, immunity should not be granted." *Cabiri*, 165 F.3d at 196 (quoting *Cargill*, 991 F.2d at 1016).

Similarly, Plaintiffs' allegations do not support a finding that "any property *exchanged for* [the expropriated] property is owned or operated" by SNCF. 28 U.S.C. § 1605(a)(3) (emphasis added). Put another way, Plaintiffs do not specifically allege that property presently owned by SNCF is somehow derived from the expropriated property, and they cite no authority that would permit the Court to infer such traceability. Instead, they allege in a conclusory fashion that "Defendants . . . retained and converted the Property and its derivative profits into their own property . . . ." (Compl. ¶ 73.) This blanket allegation against all Defendants simply restates, in different terms, the text of the "property exchanged for such property" component of prong 4(b). As such, it is insufficient to satisfy Plaintiffs' obligation of demonstrating that immunity should not be granted.

At oral argument, Plaintiffs' counsel stated that

> there is a strong inference that [SNFC does] own [the expropriated] property because although the Mattéoli Commission seems to have been able to trace funds from various places, they either didn't have the archives or couldn't — didn't publicize anything about the SNFC. I don't believe [SNCF is] mentioned in the Mattéoli Commission.

(Tr. at 76:5-10.) This argument fails to recognize that, because SNFC has established

that it is a "foreign state" as an "agency or instrumentality of France" under the FSIA, Plaintiffs bear the burden of demonstrating that SNCF is *not* entitled to sovereign immunity. Thus, the failure of the Mattéoli Commission to mention SNCF in its 3,000-page report provides no support for an inference that the expropriated property, or property derived therefrom, is "owned or operated" by SNCF. To the contrary, the absence of any such reference in the Mattéoli Report serves to underscore Plaintiffs' failure to offer evidence, or even to allege, that the property taken by SNCF is in fact presently "owned or operated" by SNCF in any way.

In addition to the Mattéoli Report, the National Center for Scientific Research (the "CNRS") prepared a 1996 report in collaboration with SNCF, titled "The SNCF Under the German Occupation, 1940-1944" (the "CNRS Report"). (*See* Snodgrass Decl. Ex. C at 10.)[8] The Administrative Court of Toulouse found that the CNRS Report contains "incontestable and precise historical data" regarding SNCF during the relevant period. (*Id.* at 13.) Significantly, the Toulouse court relied on the CNRS Report when it held SNCF liable in *Lipietz v. SNCF*. (*Id.* at 10 ("[T]he record, notably the [CNRS] report . . . shows that the railroad company . . . transported the Jews to camps within French territory . . . involv[ing] the forceful transfer of the persons being transported . . . .").)

---

[8]   The CNRS Report is not in the record. Nevertheless, it is referred to in *Lipietz v. SNCF*, a copy of which is before the Court. (*See* Snodgrass Decl. Ex. C.) The Court need not, and does not, take judicial notice of the contents of the Report in order to observe, based on the characterization of the Report in the record, that "precise historical data" regarding some of the contents of the SNCF archives is publicly available. (Snoddgrass Decl. Ex. C at 13.)

Thus, both the CNRS Report and the Mattéoli Report contain information that has been relied on in other contexts to assign liability to entities that are parties to this action. And yet, Plaintiffs have not cited to any portion of these Reports in support of their argument that the "owned or operated" component of prong 4(b) is met as to SNCF. Contrary to counsel's assertion, the absence of such evidence does not permit the Court to draw an inference in Plaintiffs' favor.

Finally, as explained in more detail below, *see infra* Part II.B.4, Plaintiffs have not demonstrated an entitlement to jurisdictional discovery, and comity concerns militate strongly against granting the request.[9] The present record is sufficient to resolve the application of the FSIA to SNCF. The Court finds that Plaintiffs have not adequately alleged under 28 U.S.C. § 1605(a)(3) that the expropriated property, or "any property exchanged for such property," is "owned or operated" by SNCF. Accordingly, the "takings" exception is inapplicable, and SNCF is entitled to sovereign immunity under the FSIA.

### 3. France

Relying exclusively on prong 4(b) of the "takings" exception, Plaintiffs argue that jurisdiction exists over France because "property in France is owned or operated by the CDC and SNCF," which are "agencies or instrumentalities" of France that are "engaged in a commercial activity in the United States." (*See* Pls.' Opp'n at 19.) France responds that prong 4(a) provides the sole basis on which jurisdiction over a foreign sovereign may be asserted, and that "Plaintiffs' failure to allege that [the expropriated] Property is located in the United States . . . is fatal to their claim." (France Mem. at 9.)[10] For the reasons set

---

[9]   The magnitude of the comity concerns implicated by Plaintiffs' request with respect to SNCF is illustrated by the fact that Congress itself has taken up the issue of whether SNCF and similar railroads are entitled to sovereign immunity for their Holocaust-related conduct. On October 1, 2007 and September 10, 2008, respectively, bills were introduced in the United States House of Representatives and Senate that sought to expand the federal courts' subject matter jurisdiction to decide claims against railroads relating to Holocaust victims' deportation to Nazi-run concentration camps. S. 3462, 110th Congress (2008); H.R. 3713, 110th Congress (2007). The proposed legislation would render the FSIA inapplicable to SNCF, as well as other railroads involved in deporting victims to concentration camps. *See* S. 3462 § 2(b). These congressional attempts to expand the federal courts' subject matter jurisdiction and allow railroads involved in the Holocaust to be sued are consistent with the Court's conclusion that, under the *current* statutory framework, Congress has not granted the Court subject matter jurisdiction to decide Plaintiffs' claims against SNCF.

[10]   France's argument is consistent with some of the language in *Garb*, which suggests that the "takings" exception is only applicable to a foreign sovereign where prong 4(a) is satisfied. *See Garb*, 440 F.3d at 589. Specifically, the *Garb* court stated that prong 4(a) "sets a higher threshold of proof for suing foreign states in connection with alleged takings by requiring that the property at issue be 'present in the United States.'" *Id.* (quoting 28 U.S.C. § 1605(a)(3)). Next, the court indicated that prong 4(b) may only be used to subject an "agency or instrumentality" of a foreign state to jurisdiction in the United States: "the second clause of the fourth element . . . permits a plaintiff to bring suit against an 'agency or instrumentality of [a] foreign state . . . .'" *Id.* (quoting 28 U.S.C. § 1605(a)(3)). This language was *dicta*, however, because the *Garb* court concluded that the Ministry of the Treasury of Poland was not an "agency or instrumentality" of Poland. *Id.* at 598. Thus, because the plaintiffs conceded that prong 4(a) was inapplicable and relied exclusively on prong 4(b) for purposes of their appeal, *see id.* at 589, the lack of an "agency or instrumentality" of a foreign sovereign in the case was dispositive of the Second Circuit's inquiry.

forth below, the Court concludes that France is entitled to sovereign immunity, regardless of whether prong 4(b) may be applied in connection with assessing a foreign sovereign's immunity under the "takings" exception of the FSIA.

Clearly, Plaintiffs have not alleged that the expropriated property is "present in the United States" under prong 4(a). To the contrary, they "seek compensation for personal *property in France* taken during World War II in violation of international law." (Compl. ¶ 1 (emphasis added).) Thus, the absence of an allegation that the expropriated property is currently located in the United States prevents Plaintiffs from making the "higher showing of proof" required by prong 4(a) of the "takings" exception. *Garb*, 440 F.3d at 589.

Assuming, *arguendo*, that prong 4(b) is applicable, it is likewise unavailing with respect to Plaintiffs' argument that France is not entitled to sovereign immunity under the FSIA. Under prong 4(b) Plaintiffs would be required to show that the allegedly expropriated property "is owned or operated by an agency or instrumentality" of France. *Id.* Plaintiffs cannot make this showing based on their allegations against France alone because France is not an "agency or instrumentality" of itself. *See Garb*, 440 F.3d at 589 ("'[T]he Republic of Poland is not an agency or instrumentality of a foreign state,' because it is 'the foreign state itself.'"). Nor can Plaintiffs establish that prong 4(b) is satisfied simply by incorporating against France their allegations as to SNCF and CDC. As discussed above, although CDC and SNCF are both instrumentalities of France, Plaintiffs' allegations do not satisfy prong 4(b) with respect to those entities. Thus, even

if a foreign sovereign may lose its immunity as a "foreign state" through the application of prong 4(b), no Defendant in this case satisfies that element of the "takings" exception.

Accordingly, because the allegedly expropriated property is not present in the United States, and because Plaintiffs have not demonstrated that an agency or instrumentality of France is engaged in conduct that would justify stripping France of sovereign immunity, Plaintiffs' claims against France are dismissed for lack of subject matter jurisdiction pursuant to the FSIA.

### 4.  Jurisdictional Discovery

Finally, Plaintiffs assert that they are entitled to jurisdictional discovery if the facts "do not seem sufficiently clear." (Pls.' Opp'n at 22.) The Court finds that Plaintiffs' allegations and arguments do not demonstrate that jurisdictional discovery would be fruitful or that it would be likely to alter the Court's FSIA analysis. In addition, the comity concerns present in this case weigh strongly against the requested discovery. Therefore, Plaintiffs' request for jurisdictional discovery is denied.

"[W]here jurisdictional facts are placed in dispute . . . . [a] district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (internal quotation marks omitted). While the Court must "give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction . . . ," *id.* (internal citation omitted), "in the FSIA context, 'discovery should be ordered circumspectly and only to verify allegations of specific facts

crucial to an immunity determination,'" *Em Ltd.*, 473 F.3d at 486 (quoting *Rafidain*, 150 F.3d at 176).

Plaintiffs argue that their limited access to closed archives maintained by SNCF and France prevents them from substantiating the jurisdictional bases for their claims.  (*See, e.g.*, Pls.' Opp'n at 6; Tr. at 76.)  However, as discussed above with respect to SFNC, Plaintiffs have not cited to any of the publicly available studies relating to these events, such as the Mattéoli and CNRS Reports, to suggest how such discovery would bolster their jurisdictional arguments.

*Reiss v. Societe Centrale du Groupe des Assurances Nationales*, 235 F.3d 738 (2d Cir. 2000), cited by Plaintiffs in their opposition brief (Pls.' Opp'n at 23 n.24), is not to the contrary.  There, although it was undisputed that the defendants were "foreign states" under the FSIA, the district court dismissed the claim for lack of personal jurisdiction under New York's long-arm statute without analyzing sovereign immunity.  *Id.* at 743.  The district court made that finding based solely on the pleadings and excerpts from the plaintiff's deposition.  The Second Circuit remanded the case with instructions to consider the applicability of the FSIA's "commercial activity exception," 28 U.S.C. § 1605(a)(2), and it suggested that factual findings were necessary regarding whether there was an agency relationship between the plaintiff and the defendant entities.  *Id.* at 747-48.  The court suggested that depositions of two of the defendants' principals "would be helpful . . . to assist the court in undertaking an FSIA jurisdictional analysis" that had not previously been conducted.  *Id.*  The language cited by Plaintiffs — "[plaintiff] should be permitted to go forward with the discovery to

which he is entitled," *id.* at 748 — refers to discovery that had already been ordered by the district court before the defendants filed their motions to dismiss on jurisdictional grounds.  *See id.*  The *Reiss* court was not suggesting that plaintiffs are *entitled* to discovery on all FSIA issues.

Comparison to *Reiss* illustrates why discovery is unwarranted here.  First, unlike in *Reiss*, the Court has focused on the preliminary issue of subject matter jurisdiction under the FSIA before looking to other merits questions.  Second, in doing so, the Court has not only assumed the truth of Plaintiffs' allegations, but also considered additional evidentiary materials submitted by all parties.  These materials do not suggest that discovery with respect to these issues would aid the Court's analysis.

Finally, and most importantly, the discovery requested by Plaintiffs raises far greater comity concerns than those at issue in *Reiss*.  In *Reiss*, the court suggested that two people involved in the management of the defendant entities be deposed in order to resolve the agency issue presented by the case.  *Id.* at 747.  Such discovery could be narrowly tailored through specific questions bearing on the jurisdictional inquiry, and it was to be conducted on behalf of only one plaintiff in connection with what was essentially a contract dispute.  Here, however, Plaintiffs' counsel requests broad documentary discovery on behalf of a potentially large class, at least part of which would be conducted in the closed archives of "foreign states" under the FSIA.  These requests raise serious comity concerns insofar as they would require the Court to order a foreign sovereign and its instrumentality to provide access to their sealed archives.  *See*

*First City, Texas Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998).

Moreover, the narrow discovery ordered in *Reiss* did not significantly interfere in the Executive Branch's exercise of its foreign affairs power. The circumstances of this case, on the other hand, require a "delicate balancing" of these issues. *Rafidain*, 150 F.3d at 176. First, the Executive Branch has described the interests of the United States in this matter through its Statement of Interest. (Statement of Interest at 11-14.) Although the Executive's Statement focuses on CDC, the general interests it describes also bear on the Court's overall exercise of its discretion in connection with Plaintiffs' discovery request.

Second, the subject matter of Plaintiffs' claims implicates numerous issues for both the United States and France, as explained in the Executive Agreement relating to the alternative fora. (*See generally* Executive Agreement.) Both nations agreed that these types of claims are best resolved by "non-adversarial and non-confrontational" means, "outside of litigation." (*Id.* at 3.) Moreover, one of the "integral part[s]" of the Executive Agreement was the understanding that it is difficult to produce evidence of Holocaust-era harms. (*Id.* at 5, Annex B at 2-3.) France and the United States, as well as the parties to the Joint Statement, chose a specific set of solutions to this issue — the "relaxed standards of proof" of the CIVS and the availability of compensation from the Fund where the Commission is unable to adequately substantiate victims' claims. (*See id.* Annex B at 1-3.) Ordering discovery in United States litigation based on the same types of claims would directly conflict with the principles underlying the Executive Agreement.

In conclusion, and in contrast to the Court's consideration of the substantive applicability of the FSIA's "takings" exception, the Court's exercise of discretion in relation to Plaintiffs' jurisdictional discovery requests is directly informed by the comity analysis discussed *infra* in Parts IV.B.2 and 3. *See Rafidain*, 150 F.3d at 176; *Scheidemann v. Qatar Football Ass'n*, No. 04 Civ. 3432 (LAP), 2008 WL 144846, at *7 (S.D.N.Y. Jan. 15, 2008). Appropriate deference to principles of international comity strongly suggests that discovery is inappropriate under these circumstances. Accordingly, for the reasons stated above and because the present record is sufficient to resolve Defendants' motions under the FSIA, Plaintiffs' discovery request is denied.

## IV. JUSTICIABILITY

Defendants argue that Plaintiffs' claims are nonjusticiable under the political question doctrine and principles of international comity. (CDC Mem. at 8-9; France Mem. at 11-14; SNCF Mem. at 20-23.) The Court agrees and finds that, even if it had subject matter jurisdiction over the Defendants pursuant to the "takings" exception of the FSIA, for the reasons set forth below and subject to the limitations described, the circumstances of the case would make abstention on justiciability grounds appropriate.

### A. Law

The power of the federal judiciary is limited "to those disputes which confine federal courts to a rule consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Flast*

v. Cohen, 392 U.S. 83, 97 (1969). These limitations on federal courts are expressed through the broad concept of justiciability. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974) (citing *Flast*, 392 U.S. at 95). Of the broad catalog of considerations bearing on justiciability, Plaintiffs' claims require the Court to apply the political question doctrine and principles of international comity.

### 1. The Political Question Doctrine

The application of the political question doctrine in the field of foreign relations requires "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Baker v. Carr*, 369 U.S. 186, 211-12 (1962); *see also Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). In *Baker*, the Supreme Court identified six tests to guide this analysis:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6]

the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *see also Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (characterizing *Baker* as setting forth "six independent tests for the existence of a political question"). Based on these tests, the doctrine is "essentially a function of separation of powers." *Baker*, 369 U.S. at 217; *see also Kadic*, 70 F.3d at 249.

The fourth *Baker* test, which is particularly relevant here, is satisfied "only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Kadic*, 70 F.3d at 249. The "preferable approach is to weigh carefully the relevant considerations on a case-by-case basis," and the analysis is "greatly reinforced by the historic deference due to the Executive in the conduct of the foreign relations of the United States." *Whiteman*, 431 F.3d at 69-70.

### 2. International Comity

"[C]ourts in this country have long recognized the principles of international comity and have advocated them in order to promote cooperation and reciprocity with foreign lands." *Pravin Banker Assocs. Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 854 (2d Cir. 1997). "International comity is 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation.'" *Id.* (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)). Under these principles, "United States courts 'ordinarily refuse to review acts of foreign

governments and defer to proceedings taking place in foreign countries . . . .'" *Jota v. Texaco, Inc.*, 157 F.3d 156, 159-60 (2d Cir. 1998) (quoting *Pravin*, 109 F.3d at 854); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 422 (2d Cir. 2005) ("[I]nternational comity is clearly concerned with maintaining amicable working relationships between nations."). These principles "vary in their application depending on whether a party seeks the recognition of a foreign judgment that has become final, or whether a party seeks 'the recognition of a pending foreign proceeding that has yet to reach a final judgment.'" *Klonis v. Nat'l Bank of Greece, S.A.*, 487 F. Supp. 2d 351, 354 (S.D.N.Y. 2006) (quoting *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006)).

"[C]omity of the courts" is a set of "principles whereby judges decline to exercise jurisdiction over matters more appropriately adjudged elsewhere." *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 817 (1993) (Scalia, J., dissenting in part); *see also Royal & Sun Alliance*, 466 F.3d at 92; *Klonis*, 487 F. Supp. 2d at 354. To justify abstention under these principles, the foreign proceedings must be parallel, the alternative forum must be adequate, and "additional . . . circumstances must be present . . . that outweigh [courts'] general obligation to exercise their jurisdiction." *Royal & Sun Alliance*, 466 F.3d at 94-96. In connection with this analysis, courts must display "proper respect for litigation in and the courts of a sovereign nation," fairness to litigants, and judicial efficiency. *Id.* at 94. Other relevant factors include "the similarity of the parties, the similarity of the issues, the order in which the actions were filed . . . , the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction." *Id.*

## B. Analysis

Before resolving the justiciability issues, the Court notes that ambiguity in the record requires a caveat on the analysis that follows. As previously stated, Plaintiffs define their proposed class as individuals, as well as some of those individuals' heirs and beneficiaries, who were "interned in holding and concentration camps in France or transported by SNCF to holding camps in France . . . during [World War II]." (Compl. ¶ 51.) Plaintiffs' putative class is not limited to French citizens (*see, e.g.*, *id.* ¶ 10), and the Holocaust victims bringing this action include both Jews and "other 'undesirables'" (*id.* ¶ 2).[11]

It is unclear from the record, however, whether the French alternative fora — the CIVS, the Fund, and the Shoah Foundation — are available to provide compensation to non-Jews. The language of the Executive Agreement is unqualified, referring to "*any and all claims* that have been or may be asserted against the Banks . . . ." (Executive Agreement at 4 ¶ 1 (emphasis added).) Similarly, the January 19, 2001 Declaration of Eizenstat, who was intimately involved in the negotiations surrounding the settlement with the French banks and the establishment of the alternative fora, asserts that "it is in the

---

[11]   Plaintiffs also represented at oral argument on these motions that the putative class includes pilots from the United States armed services who were captured behind enemy lines. (*See* Tr. at 63-64, 86.)

enduring and high interest of the United States to . . . support[] efforts to achieve dismissal of (i.e., 'legal peace' for) *all Holocaust-related claims* against French Banks." (Eizenstat Decl. ¶ 37 (emphasis added).)

In addition, the January 18, 2001 Joint Statement, to which Plaintiffs' counsel was a signatory, sets forth the goal of an "all-embracing and enduring legal peace for the Banks for *all claims that have been or may be asserted against such banks* arising out of World War II." (Joint Statement at 2 ¶ b (emphasis added).)   Consistent with these representations, in this litigation, the Executive Branch recommends dismissal of Plaintiffs' claims against CDC without regard to whether or not they are Jewish. (*See* Statement of Interest at 1-2.)

On the other hand, the French "Law of July 22, 1941," which sets forth CDC's role in accepting deposits from expropriations such as those that took place in Drancy, refers solely to Jews, not other "undesirables." (*See* Rosenfeld Decl. Ex. D.)   The Mattéoli Report is titled "Summary of the Work by the Study Mission on the Spoliation *of Jews* in France." (*See* Statement of Interest at 3 (emphasis added).)   A "Notice to Victims" published in connection with the *Bodner* matter, stated that "[y]ou are eligible to apply for compensation [from the CIVS] if you or your family . . . *were Jewish*, resided in France prior to or during World War II and believe that your family may have had a personal or business account at a bank in France." (Rodd Decl. Ex. 11 ¶ 9 & attachment (emphasis added).)[12]

Moreover, the CIVS' full, translated title, "Commission for the Compensation of Victims of Spoliation Resulting from *Anti-Semitic Legislation* in Force During the Occupation" (Executive Agreement at 2 (emphasis added)), suggests that claimants are only eligible for relief if their claims arise out of spoliations undertaken pursuant to laws discriminating against Jews.

Plaintiffs' eligibility for relief from these mechanisms, especially the CIVS, is relevant to the resolution of the comity issues before the Court.   Accordingly, the following justiciability analysis applies to all class members who either have sought, or are eligible to seek, compensation from the French alternative fora (the "eligible Plaintiffs").   For the reasons set forth below, even if the Court possessed subject matter jurisdiction over Defendants, it would abstain from deciding the eligible Plaintiffs' claims.

### 1.  CDC

CDC argues that Plaintiffs' suit presents a political question because it would be impossible to resolve the case "without expressing lack of the respect due coordinate branches of government." *Baker*, 369 U.S. at 271. (*See* CDC Mem. at 8-10.)   Plaintiffs respond that the Joint Statement and Executive Agreement do not apply to CDC because it is not a "bank" as defined in those agreements (Pls.' Opp'n at 43), and that the Statement of Interest submitted by the

---

[12]   The proposed class in this action is broader than that in *Bodner*.   *Bodner* involved two consolidated cases in the Eastern District of New York: *Benisti v. Banque Paribas*, No. 98 Civ. 7851 (SJ) and *Bodner v.*

*Banque Paribas*, No. 97 Civ. 7433 (SJ).   *See Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 121-22 (E.D.N.Y. 2000).   The proposed class in *Bodner* was limited to Jewish victims of the Holocaust and their relatives, *see id.* at 121, and it would have made sense to limit the Notice of Settlement in similar terms.

Department of Justice in this action is not entitled to deference from the Court (*see id.* at 41).

Plaintiffs' argument thus presents a subsidiary issue relating to the construction of the word "bank" in the Joint Statement and the Executive Agreement. CDC contends that it is a "bank," as defined in Annex B of the Joint Statement. The United States concurs with that position. (*See* Statement of Interest at 11 ("The United States has determined that the CDC is a 'bank' as that term is used in the Executive Agreement, and that plaintiffs' claims against the CDC are thus covered by the Agreement.").) This interpretational issue, however, like matters of statutory or treaty interpretation, is a matter "well within the province of the Judiciary." *Altmann*, 541 U.S. at 701 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446, 448 (1987)); *Jones v. Meehan*, 175 U.S. 1, 32 (1899). "[T]he United States' views on such an issue are of considerable interest to the Court, [but] they merit no special deference." *Altmann*, 541 U.S. at 701.

Under the Joint Statement, the definition of "bank" includes "all other institutions that receive deposits . . . ." (Joint Statement Annex B.) The Court finds that CDC fits within this broad definition. By legislation dated July 22, 1941, the French government directed that proceeds from sales of the expropriated property at issue be "paid . . . *into a deposit account* opened with [CDC] in the name of the person whose assets" were liquidated. (Rosenfeld Decl. Ex. D (emphasis added).) A declaration submitted by Olivier Ritz, the head of CDC's Legal and Tax Department, states that "CDC accepts and safeguards public and private deposits." (Ritz Decl. ¶ 3; *see also* Rosenfeld Decl. ¶ 5

("[T]he CDC accepts as the 'public depository of France' certain types of deposits.").) A provision of the Executive Agreement directs CDC to accept a $50 million deposit in "[a]n interest-bearing escrow account." (Executive Agreement Annex B at 1-2.) Plaintiffs' allegations also suggest that the CDC is a "bank" under this definition: "[t]he CDC, the national public *depository* of France, *accepted*, *held*, and *is holding* today, Property consisting of money taken from Plaintiffs, or money received from the sale of Plaintiffs' non-monetary property." (Compl. ¶ 9 (emphasis added); *see also id.* ¶¶ 20-21.) Thus, the Court finds that CDC meets the definition of "bank" under the Joint Statement. Accordingly, the principles of the Joint Statement and Executive Agreement, as well as the policy interests explained by the United States in its Statement of Interest, apply to CDC in this action.

The next issue presented is whether deciding Plaintiffs' claims against CDC would "express[ a] lack of the respect due" to the Executive branch under the fourth *Baker* test. *Baker*, 369 U.S. at 217. The Executive branch has taken a position on this issue through the Department of Justice's Statement of Interest. Although it "does not suggest that [its] policy interests . . . in themselves provide an independent legal basis for dismissal," and it "takes no position on the merits" of any party's arguments, "[b]ecause of the United States' strong interests in the success of the CIVS, the Foundation, and the Fund . . . [it] recommends dismissal on any valid legal ground." (Statement of Interest at 14.) Thus, the Court must consider whether deciding Plaintiffs' claims would conflict with this position of the Executive Branch.

The Court is mindful that it "should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 n.21 (2004). The Executive's views are entitled to particular deference where, as here, it chooses "to express its opinion on the implications of exercising jurisdiction over particular [parties] in connection with their alleged conduct . . . ." *Altmann*, 541 U.S. at 702; *see also Whiteman*, 431 F.3d at 69 ("Judicial deference to the Executive Branch on questions of foreign policy has long been established under the prudential justiciability doctrine know as the 'political question' doctrine . . . ."). Consistent with *Whiteman*, the Court affords deference to the Executive's Statement of Interest regarding dismissal of the claims against CDC, because of both its source and the persuasiveness of its reasoning.

The foreign policy interests raised in the Statement of Interest are parallel to those considered by the *Whiteman* court. In *Whiteman*, the Second Circuit held that, under the fourth *Baker* test, the case presented a nonjusticiable question because:

(1) the Executive Branch has exercised its authority to enter into executive agreements respecting the resolution of those claims; (2) the United States Government (a) has established through an executive agreement an alternative international forum for considering the claims in question, and (b) has indicated that, as a matter of foreign policy, the alternative forum is superior to litigation; and (3) the United States foreign policy advanced by the executive agreement is substantially

undermined by the continuing pendency of the claims.

*Whiteman*, 431 F.3d at 74. The Court finds that each of factors is applicable here.

First, similar to *Whiteman*, the interests of the United States described in the Statement of Interest developed over a period of multi-party negotiation culminating in an Executive Agreement aimed at achieving "all-embracing and enduring legal peace" with respect to Plaintiffs' claims against CDC and other French banks. (Statement of Interest at 3-7.) The Executive states that its foreign policy interests include: (1) providing compensation to victims in a timely and non-onerous manner; (2) a continued alliance with France to facilitate joint diplomatic efforts in Lebanon, Iran, Afghanistan, NATO, and the United Nations; (3) avoiding entanglement and interference by France and the United States in conflicts between Holocaust survivors organizations; and (4) the "fulfillment of a half-century effort to complete the task of bringing justice to victims of the Nazi era." (*Id.* at 11-14.)

Second, although the Executive Agreement did not itself establish these alternative compensation mechanisms, the Agreement endorses the CIVS, the Shoah Foundation, and the Fund as preferable fora for hearing claims of property spoliation against banks such as CDC. (*See* Executive Agreement at 3-4, Annex B). The Statement of Interest makes clear that the Executive Branch views these fora as being superior to litigation: "[t]he successful compromise reached in these negotiations . . . is an example of the advantages for all concerned when the legal and moral claims of Nazi-era victims are dealt with through dialogue,

negotiation, and cooperation, instead of prolonged litigation and controversy." (Statement of Interest at 17.) The Executive Branch also represents to the Court that it believes these fora should be the "exclusive" remedies for Plaintiffs' claims against CDC: "[i]t would be in the foreign policy interests of the United States for the CIVS, the Fund, and the Foundation to be the exclusive fora and remedies for the resolution of all claims asserted against banks arising from their activities in France during World War II." (*Id.* at 11.)

The Executive's positions in the Statement of Interest are bolstered by the fact that the United States government continues to engage in diplomatic efforts aimed at supporting and improving these alternative fora. The Joint Statement indicates that two members of the Fund's board are appointed by the United States. (Joint Statement Annex B at 3.) Moreover, in February 2006, the United States exchanged letters with France supplementing and amending the Executive Agreement to provide for additional compensation for survivors and their successors. (*See* Gélineau-Larrivet Decl. ¶ 34.) Previous diplomatic letters regarding the Agreement were exchanged in August 2001, May 2002, and February 2005. (*Id.*) Therefore, not only has the Executive Branch previously expressed support for these processes, but it also continues to engage in efforts to improve their effectiveness.

Plaintiffs assert that the final component of *Whiteman*'s holding — that "United States foreign policy advanced by the executive agreement is substantially undermined by the continuing pendency of the claims," *Whiteman*, 431 F.3d at 74 — distinguishes it from this case. In *Whiteman*, the pending litigation was "holding up the implementation of the [General Settlement Fund]" established to compensate Austrians victimized by Nazis during World War II. *Id.* at 72. By comparison, Plaintiffs argue, this litigation does not substantially undermine United States policy because the CIVS, the Shoah Foundation, and the Fund are presently operational. (Pls.' Opp'n at 42-44.) Although that is undoubtedly a factual distinction to be considered, the difference does not require the Court to find that Plaintiffs' claims are justiciable. *See Whiteman*, 431 F.3d at 74 ("[W]e need not determine whether any one of these factors is necessary or sufficient for dismissal . . . ."). Notwithstanding this factual distinction, the same type of issues that existed in *Whiteman* are presented by the conflict between this action and the foreign policy interests described in the Statement of Interest and Executive Agreement.

In evaluating the harm imposed by the continued pendency of the claims, the *Whiteman* court expressed concern about impeding the United States policy interest in compensating victims during their lifetimes. *See id.* The Statement of Interest in this case describes the same goal for the French alternative fora: "bring[ing] some measure of justice to Holocaust survivors and other victims of the Nazi era, who are elderly and are dying at an accelerated rate, in their lifetimes . . . ." (Statement of Interest at 12.) The Executive has concluded that, for those victims, "the best way to accomplish this goal is through negotiation and cooperation . . . ." (*Id.*) Similar to *Whiteman*, the Executive Branch takes the position that the French alternative fora are "faster," present "less uncertainty," and would allow Plaintiffs to

avoid the "attendant delays, uncertainty, and legal hurdles" of litigation. (*Id.*)

In terms of the harm to United States foreign policy, the language of the Statement of Interest suggests no distinction between the impediment to the commencement of the Austrian settlement fund posed by the pendency of the *Whiteman* litigation and the threat to the continued viability of French alternative fora posed by this litigation. In fact, it states that the continued success of the alternative fora is "predicated on the dismissal of claims against French banks," such as CDC. (*Id.* at 1-2.) Expedient compensation and dispute resolution are key goals of both the Austrian and the French alternative fora. Whether pending litigation delays the implementation of those fora, as in *Whiteman*, or threatens the continued availability of the "all-embracing and enduring legal peace" sought through the alternative compensatory mechanisms, as here, the Executive Branch has cautioned that permitting victims to pursue their claims in United States courts hinders the administration of the French alternative fora.

To disregard the Executive's position, which it expresses as part of its power to conduct foreign affairs, would express a lack of respect due to a coordinate branch of the government. *See Baker*, 369 U.S. at 216. Therefore, the Court declines to draw a dispositive distinction between the significance of the impediment to the United States' expressed policy interests in *Whiteman* and in this case, especially when the reasoned view of the Executive Branch is that they are similarly problematic.

Finally, Plaintiffs argue that *Whiteman* is distinguishable because, in that case, the Executive Branch submitted a "supplemental letter" to the Second Circuit in addition to the Statement of Interest it submitted to the district court. *See Whiteman*, 431 F.3d at 62-63 (quoting the supplemental letter of the United States). The supplemental letter stated that "deference to 'the views of the Executive on this nation's foreign policy interests in determining whether to exercise jurisdiction in a particular case' supports the dismissal of plaintiffs' claims." *Id.* at 69. The Court finds that, despite the specificity of the Executive's request for dismissal in *Whiteman*, its position that the pendency of this litigation against CDC threatens United States policy interests is nonetheless entitled to deference.

In an attempt to highlight the difference between the Executive's second submission in *Whiteman* and the Statement of Interest here, Plaintiffs cite *Sarei v. Rio Tinto, PLC*, 456 F.3d 1069 (9th Cir. 2006), *vacated and superceded*, 487 F.3d 1193 (9th Cir. 2007), *reh'g en banc granted*, 499 F.3d 923 (9th Cir. 2007). The superseding opinion in *Sarei* provides two reasons for the court's decision that the "close question" of justiciability did not preclude the litigation. *See Sarei*, 487 F.3d at 1205. First, the Statement of Interest at issue in *Sarei* was presented in more tepid terms than the Executive's statement here:

The [Statement of Interest] begins by noting that the State Department has not been "invited" to comment on the applicability of the political question doctrine itself. It next states that "[i]n our judgment, continued adjudication of the claims . . . would risk a potentially serious adverse impact on the peace process, and hence on the conduct of our foreign relations."

*Sarei*, 487 F.3d at 1205.  Here, by contrast, the Executive seeks dismissal of the claims against CDC on "any valid legal ground." (Statement of Interest at 2.)  Although not as forceful as the supplemental letter in *Whiteman*, the Executive's contention here is more direct than that in *Sarei*.

Second, the *Sarei* court found that, but for the Statement of Interest submitted in that case, there was "little reason to dismiss [the] case on political question grounds, and therefore that the [Statement of Interest] must carry the primary burden of establishing a political question." *Id.* at 1206.  However, for the reasons discussed below in Parts IV.B.2 and 3, Plaintiffs' claims are distinguishable because the Court finds that they present justiciability issues independent of the Executive's Statement of Interest.

Finally, with respect to the fourth *Baker* test, the *Sarei* court emphasized that the Executive "explicitly did *not* request that we dismiss this suit on political question grounds." *Id.* at 1206 (emphasis in original). On this point, the Court notes developing authority in other jurisdictions for the proposition that dismissal on justiciability grounds is less appropriate where the Executive Branch does not assert that its position in a Statement of Interest, in and of itself, presents a grounds for dismissal of the case. *See Sarei*, 487 F.3d at 1206; *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 381-84 (3d Cir. 2006); *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1236-37 (11th Cir. 2004); *Beaty v. Republic of Iraq*, 480 F. Supp. 2d 60, 79-80 (D.D.C. 2007).  In *Whiteman*, the Second Circuit confronted this issue — rejecting the position similar to that taken by Plaintiffs — by distinguishing the Eleventh Circuit's holding in *Ungaro-*

*Benages*. *See Whiteman*, 431 F.3d at 71 n.16.

In *Ungaro-Benages*, the Executive entered into an agreement with the German government in which it committed to filing Statements of Interest in United States courts seeking the dismissal of claims against Germany for restitution or reparations relating to World War II. *Ungaro-Benages*, 379 F.3d at 1231.  The purpose of the agreement was to facilitate the operation of the German-run "Remembrance, Responsibility and the Future" Fund. *See id.* at 1233-34.  The agreement specified some of the reasoning the United States was to articulate in its Statements of Interest, including that "[t]he United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal." *Id.* at 1231.

The Eleventh Circuit found that the case did not present a non-justiciable political question, in part because the agreement specifying the points the United States was to raise in subsequent Statements of Interest appeared to "anticipate[] that federal courts will consider claims against German corporations." *Id.* at 1235.  The court noted that "[t]he President has purposefully chosen not to settle these claims . . . ." *Id.* at 1237.

Reviewing *Ungaro-Benages*, the Second Circuit "respectfully disagree[d]" with the Eleventh Circuit's conclusion that the agreement's language rendered the political question doctrine inapplicable. *Whiteman*, 431 F.3d at 71 n.16.  "That the United States did not represent to Austria that its statements of interest would be accorded deference in every relevant judicial forum does not preclude us from according deference to the views of the United States *in this case*." *Id.*

(emphasis in original). Thus, the *Whiteman* court concluded, the similar language of the agreements at issue in both cases was "an understandable and prudent clarification by the United States diplomatic representatives," and that the "United States' international commitment to seek dismissal 'on any valid legal ground' is entirely consistent with its view, then and now, that this litigation is harmful to U.S. foreign policy interests." *Id.*

As in *Whiteman* and *Ungaro-Benages*, the Executive Agreement in this case indicates that "the United States will recommend dismissal on any valid legal ground." (Executive Agreement Annex C at 1.) In its Statement of Interest, the Executive indicates that the policy interests it describes do not "provide an independent legal basis for dismissal." (Statement of Interest at 14.) Nonetheless, the Executive recommends dismissal "on *any* valid legal ground (*id.* (emphasis added)), and much of the Statement's language tracks the underlying Executive Agreement. (*Compare id.* at 14, *with* Executive Agreement Annex C ¶ 9.)

Especially in light of the direct quotations from the Executive Agreement, a product of United States diplomatic efforts, the Court views the corresponding language in the Statement of Interest as "an understandable and prudent clarification" by both the diplomats signing the Agreement and the government officials presenting the Statement to the Court. The absence of a second or more specific request for dismissal, as was before the Second Circuit in *Whiteman*, does not require a different conclusion. Moreover, the fact that the Executive does not believe its policy interests provide an "*independent* legal basis for dismissal," does not suggest that the

Court should not consider those interests in relation to the political question doctrine.

Under the fourth *Baker* test, a "lack of respect" to the Executive Branch would result if the Court were to disregard the Executive's declared preference for a "non-adversarial and non-confrontational" resolution of these claims "outside of litigation." (Executive Agreement at 3.) Regardless of the terms on which the Executive advocates dismissal or complies with its commitment to file Statements of Interests containing certain language, the Court cannot avoid expressing a "lack of respect" to the positions contained in these statements if it permits Plaintiffs' claims against CDC to go forward.

Put simply, the Court has conducted a case- and party-specific inquiry into the justiciability of Plaintiffs' claims against CDC, taking into account the policy interests articulated by the Executive Branch and the impact of this litigation on those interests. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 Civ. 9882 (DLC), 2005 WL 2082846, at *3 (S.D.N.Y. Aug. 30, 2005) ("Courts have assigned varying weight to statements of interest by the United States Government according to the circumstances."). Based on the record and the Statement of Interest, the Court finds that the threat of this litigation to the policy interests discussed above is significant and weighty, and that "undertaking independent resolution of *this claim* [*against CDC*] is impossible without expressing lack of the respect due the Executive Branch." *Whiteman*, 431 F.3d at 72 (internal quotation marks omitted) (emphasis added). Accordingly, even if there were subject matter jurisdiction over CDC, the Court would abstain from deciding the

eligible Plaintiffs' claims because they present nonjusticiable questions.

### 2. France

France argues that the both the political question doctrine and considerations of international comity require dismissal of the claims against it. (France Mem. at 11, 19.) Plaintiffs respond that the case does not present a political question because the Statement of Interest does not apply to France. (Pls.' Opp'n at 40, 44.) Furthermore, Plaintiffs argue that the comity doctrine is inapplicable because there is no conflict in this case between foreign and domestic law, and that the alternative fora are inadequate. (*See id.* at 34, 36.) For the reasons set forth below, the Court disagrees and concludes that it must abstain from deciding the eligible Plaintiffs' claims based on principles of international comity.

As Plaintiffs point out, the Statement of Interest is expressly limited to the claims against CDC. (*See* Statement of Interest at 2 & n.2.) France's motion wholly ignores this limitation. While an Executive Branch opinion recommending dismissal "on any valid legal ground" is not a precondition to finding a political question under the fourth *Baker* test, conducting the *Baker* analysis with respect to France on the basis of the record before the Court presents a much closer question. The Court need not reach it, however, because principles of comity lead the Court to abstain from deciding the eligible Plaintiffs' claims.

With respect to comity, Plaintiffs' primary argument is that, under *Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993), the absence of a "true conflict

between domestic and foreign law" precludes comity-based abstention. (Pls.' Opp'n at 34.) The Second Circuit has noted, however, that *Hartford Fire*'s holding is not necessarily that expansive. *In re Maxwell Commc'n Corp. plc*, 93 F.3d 1036, 1050 (2d Cir. 1996) ("As we have previously noted, *Hartford Fire* recognized that 'other concerns' might be implicated if the context were different." (citing *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 747 (2d Cir. 1994))). The Court declines to construe *Hartford Fire*'s conflict analysis as a prerequisite to the application of comity principles in this case, especially because of numerous countervailing considerations that counsel in favor of abstention.

*Hartford Fire* held, in pertinent part, that principles of comity did not prevent the extraterritorial application of the Sherman Act to British reinsurers because the Act did not conflict with British regulations covering those defendants. *See Hartford Fire*, 509 U.S. at 799. The Supreme Court reasoned that there was no conflict because conforming with United States law did not require the foreign defendants to violate British law. *See id.* The limited scope of the Supreme Court's comity holding is demonstrated by its statement that the presence of a conflict between domestic and foreign law was "[t]he only substantial question" before the Court with respect to the comity issue. *Id.* at 798. Moreover, the main authority cited in *Hartford Fire* for the "true conflict" proposition — the *Third Restatement Foreign of Relations Law* § 403 and comment j — requires conflict analysis *only* if the exercise of jurisdiction is first found to be reasonable.

*See id.* at 821 (Scalia, J., dissenting in part).[13] The *Hartford Fire* Court appears to have assumed that exercising jurisdiction over the foreign defendants was reasonable in that case. *See id.* at 799 ("We have no need in this litigation to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity."); *see also id.* at 799 n.25. Therefore, *Hartford Fire* did not forbid abstention on comity grounds in the absence of conflicting laws; it merely assumed that no other considerations existed in the case that justified abstention.

---

[13]     Section 403(1) of the *Third Restatement of Foreign Relations Law* provides that "a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable." Section 403(2) contains a non-exhaustive list of factors bearing on the reasonableness of exercising jurisdiction, including connections between the jurisdiction, the regulated party, and the conduct, the importance of the regulation, consistency with international norms, the interests of non-regulating states in the conduct at issue, and the likelihood of conflicting regulations governing the conduct.  Section 403(3) provides:

> *When it would not be unreasonable* for each of two states to exercise jurisdiction over a person or activity, but the prescriptions by the two states are in conflict, each state has an obligation to evaluate its own as well as the other state's interest in exercising jurisdiction, in light of all the relevant factors, including those set out in Subsection (2); a state should defer to the other state if that state's interest is clearly greater.

*Id.* § 403 (emphasis added).  When defining "conflict," the *Hartford Fire* Court cited to comment e of § 403, which contains the following introductory language: "*Subsection (3) applies when an exercise of jurisdiction by each of two states is not unreasonable,* but their regulations conflict."  *Id.* § 403 cmt. e (emphasis added).

In post-*Hartford Fire* cases, conflict analysis has not been rigidly invoked to preclude consideration of the full range of principles relating to international comity. *See, e.g.*, *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005) (noting that deference to foreign parallel bankruptcy proceedings "is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States").  Rather, conflict analysis is most often applied when comity principles intersect with issues of statutory construction. *See In re Maxwell Commc'n Corp.*, 93 F.3d at 1049 (characterizing comity as "simply a rule of construction" in a case requiring analysis of the extraterritorial reach of the United States Bankruptcy Code, and stating that "comity comes into play" in such a case "only when there is a true conflict between American law and that of a foreign jurisdiction" (citing *Hartford Fire*, 509 U.S. at 798)).  In a case such as this one, where comity principles must be applied to broad issues not directly involving statutory interpretation, the existence of a true conflict does not bar the Court from applying the doctrine and considering other legitimate concerns implicated by United States courts exercising jurisdiction over a foreign sovereign.  *See Jota v. Texaco, Inc.*, 157 F.3d 156, 160 (2d Cir. 1998) (noting that comity "is best understood as a guide where the issues to be resolved are entangled in international relations" (quoting *In re Maxwell Commc'n Corp. plc*, 93 F.3d at 1047)).

France's comity argument centers on "the principles that guide district courts when deciding whether to abstain from exercising jurisdiction out of deference to parallel proceedings pending in other countries."  *U.S.*

*Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 210 (S.D.N.Y. 2002) (internal quotation marks omitted). This is known as "comity of the courts." *Id.*; *see also Klonis*, 487 F. Supp. 2d at 354-55 (citing *Royal & Sun Alliance*, 466 F.3d at 92). Under these principles, abstention is appropriate where there are parallel proceedings, the alternate forum for the claim is "adequate," and there are "additional circumstances . . . that outweigh the district court's general obligation to exercise its jurisdiction." *Royal & Sun Alliance*, 466 F.3d at 94-95. For the reasons that follow, the Court finds it appropriate to abstain from deciding the eligible Plaintiffs' claims against France.

a. Parallel Proceedings

"For two actions to be considered parallel, the parties . . . must be substantially the same, litigating substantially the same issues in both actions." *Id.* at 94. The CIVS, the Fund, and the Foundation are being administered parallel to this litigation.[14]

_____

[14]   Plaintiffs argue that the Shoah Foundation "has no bearing on any of the issues raised in this case or any of the claims for restitution." (Pls.' Opp'n at 4.) This contention is belied by the reference to the Foundation in the Joint Statement: "[The Foundation] serves as a mechanism ensuring full disgorgement of any remaining assets as well as recognition and moral reparation for those who did not survive." (Joint Statement at 5; *see also* Eizenstat Decl. ¶ 25 ("The Foundation serves as the primary mechanism to achieve full disgorgement by French banks and other French institutions of any remaining assets that were not subject to restitution.").) The Court recognizes that the Foundation may not engage in a direct compensatory function to the same extent as the CIVS or the Fund. Nonetheless, the Foundation's efforts are relevant in considering the overall package of French alternative fora.

Here, the parties are "substantially the same." France is intricately involved in parallel proceedings within its borders that seek to compensate the class of victims of which some of the Plaintiffs are members. Under the Executive Agreement, France assured the United States that it will provide legal supervision, that the fora will operate with the "maximum transparency and oversight allowed under French law," and that "any person may . . . request that . . . French governmental authorities take measures to ensure compliance with the legal requirements of the [CIVS] and the Foundation." (Executive Agreement at 4-5.) The CIVS also submits some of its compensation recommendations directly to the French Prime Minister, who has specifically committed to implementing the decisions of the CIVS. (Gélineau-Larrivet Decl. ¶¶ 5, 7; *see also id.* ¶ 24.) The CIVS rapporteurs, who are active or retired judges, are appointed by the French Minister of Justice. (*Id.* ¶ 14.) Multiple agencies of the French government are involved in the claim processing and verification process, including its Department of Archives at the Ministry of Foreign Affairs, Office of Private Interests and Property, and Department of Museums of France at the Ministry of Culture. (*Id.* ¶ 13.)

Many of the named Plaintiffs in this action either have received or are seeking compensation through these mechanisms. (*See* Gremont Reply Decl. ¶¶ 3-4, Exs. A-D.) The parties participating in the alternative fora are substantially the same for those Plaintiffs, as well as for any other eligible Plaintiffs who either are, or could be, seeking compensation from the CIVS, the Fund, and the Shoah Foundation. Thus, the Court finds that, as to the eligible Plaintiffs, the parties to this

litigation are substantially the same in the French alternative fora.

The issues in these parallel proceedings are also substantially similar. In this litigation, Plaintiffs "seek an accounting, disgorgement, restitution, and the recovery of damages arising out of the participation of Defendants in a common scheme and course of conduct to obtain . . . and profit from Property taken by . . . the Defendants." (Compl. ¶ 3.) Similarly, the CIVS process was designed to provide relief for expropriations by "compensat[ing] fully the claimants for material damages for which complete restitution or compensation had not been previously received." (Joint Statement Annex A at 1.) The Fund compensates victims based on recommendations from the CIVS where the CIVS "is unable to substantiate the existence of bank assets, but is presented with credible evidence that suggests there may have been such assets and there is no evidence of restitution . . . ." (*See id.* at 2.) "[T]he [Shoah] Foundation's funding was *designed to accomplish full disgorgement by the French Government*, the Banks, and other private and public institutions of any unjust enrichment" resulting from the expropriations at issue here. (Executive Agreement at 2 (emphasis added).) Thus, in combination, the alternative fora seek to compensate a class of victims similar to Plaintiffs for injuries that are similar, if not the same, as the basis for Plaintiffs' claims in this matter.

Plaintiffs and France may not be directly adverse in the parallel proceedings in the French alternative fora, but both France and the United States view that as a positive attribute of the CIVS. (*See* Executive Agreement at 3 ("[I]t is in the interest of both

the Government of the United States and the Government of France to have a resolution of these issues that is non-adversarial and non-confrontational, and outside of litigation.").) The availability of these mechanisms to provide compensation for the alleged expropriations, as well as the French involvement in the administration of these processes, renders the French alternative fora "parallel proceedings" under principles of international comity.

b. "Adequacy"

The Court is mindful of the fact that "adequacy" is a relative term. The Executive Branch appropriately observes that "[n]o amount of money can possibly be fair under [these] circumstances." (Statement of Interest at 16 (quoting *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 141 (E.D.N.Y. 2000).) That being said, respect for the rule of law requires the Court to make an assessment of the "adequacy" of the French alternative fora, in order to determine the proper application of the principles of international comity. The Court does so with caution, and the following analysis is in no way intended to minimize the magnitude of the atrocities underlying Plaintiffs' claims.

Plaintiffs argue that abstention is inappropriate based on *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117 (E.D.N.Y. 2000), a similar lawsuit brought against French banks relating to their World War II conduct. In *Bodner*, the court declined to abstain on comity grounds, in part, because "[t]here is no pending litigation in France, nor is the Court aware of any current law or policy of the French government which could either supplant or fully redress plaintiffs' claims." *Id.* at 130. Intervening events

require additional analysis here. Since *Bodner*, the CIVS, the Fund, and the Shoah Foundation have all commenced their functions. The Court finds that, in their present form, these fora are appropriate and adequate alternative fora for the pursuit of the eligible Plaintiffs' claims.

Gérard Gélineau-Larrivet, Chairman of the CIVS in 2006, has submitted a declaration describing the history of the Commission and its processes in detail. The Executive Branch also reviewed the Commission's proposed procedures and found that the CIVS would "without question, provide benefits to more victims, and will do so faster and with less uncertainty than would litigation, with its attendant delays, uncertainty, and legal hurdles." (Eizenstat Decl. ¶ 31.) The Executive's continued involvement in improving the CIVS process, as evidenced by its exchange of letters with France relating to the CIVS in 2001, 2002, 2005, and 2006, serves as a further endorsement of the adequacy of this forum. (*See* Gélineau-Larrivet Decl. ¶ 34.)

As a consequence of the evidentiary difficulties attendant in proving expropriations that occurred more than sixty years ago, the CIVS employs relaxed standards of proof in order to permit recovery for a broad class of victims. (*See* Gélineau-Larrivet Decl. ¶ 10; Eizenstat Decl. ¶ 20.) Claims by elderly people who were direct victims of the expropriations are given priority. (Gélineau-Larrivet Decl. ¶ 9.) Claimants may appear with representatives or through agents, which allows citizens from nations other than France to seek compensation from the CIVS without the burden of international travel. (*See id.* ¶¶ 16, 20, 22; Eizenstat Decl. ¶ 20.)

The banks that signed the Joint Statement agreed to promptly pay all CIVS's compensation recommendations. (Eizenstat Decl. ¶ 21; *see also* Gélineau-Larrivet Decl. ¶¶ 26-29.) The Commission issues regular public reports to promote transparency, and its overall effectiveness and individual decisions are scrutinized by Holocaust survivors organizations. (*See* Eizenstat Decl. ¶ 23; *see also* Rakower Decl. ¶ 5 (listing nine publicly available reports since March 2001).) Finally, where claimants are unable to provide enough proof of their claims before the CIVS, the Commission may refer those individuals to the Fund for potential compensation. (*See* Eizenstat Decl. ¶ 24.)

Plaintiffs object to the administration of the CIVS, pointing to instances of arbitrary or biased decision making (Rodd Decl. Ex. 1A ¶¶ 6, 9-11), denials of representation (*id.* ¶ 13), delays in claims processing (*id.* ¶¶ 7-8), erroneous compensation calculations (*id.* ¶¶ 17-18), and futility of appellate review (*id.* ¶¶ 22-28). (*See generally* Rodd Decl. Ex. 1B.) The Court takes these objections seriously, and it assumes that those involved in the CIVS process will seek to address Plaintiffs' concerns and improve each of the alternative fora. Nonetheless, Plaintiffs' objections are insufficient because they are based more on anecdotes than systemic defects in the CIVS. *Cf. PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998) ("[C]onsiderations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards."). Although some named Plaintiffs object to the manner in which they were compensated (*see* Pls.' Sur-Reply at 4-7; Tamen Decl. Exs. C-E), twenty-two of the twenty-six named Plaintiffs have filed claims with the CIVS.

(Gremont Reply Decl. ¶¶ 3-4.) Eighteen of them have already been compensated. (*Id.*) Although these processes may be imperfect, the flaws alleged do not establish that the French alternative fora are inadequate for purposes of this comity analysis

In conclusion, while the CIVS process unquestionably diverges from United States litigation procedures, it must be noted that such was the intention of its creators, who wished to focus on flexible and expedient recovery for as broad a class of victims as possible. (*See* Eizenstat Decl. ¶¶ 18, 28, 31-33.) The Executive Branch views these mechanisms as a preferable alternative to litigation in United States courts. (*See* Statement of Interest at 12-13; Eizenstat Decl. ¶¶ 30-34.) An independent review of the record confirms the Executive's position, and the Court declines to second-guess the priorities set by the parties to the Joint Statement and the Executive Agreement. Accordingly, the Court finds that, to the extent class members are eligible to submit claims to these alternative fora, the CIVS, the Fund, and the Shoah Foundation are "adequate" under principles of international comity.

c. Additional Circumstances Justifying Abstention

The existence of parallel and adequate proceedings does not relieve the Court of its duty to "exercise the jurisdiction given to [it]" by Congress. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Rather, "additional circumstances must be present . . . that outweigh the district court's general obligation to exercise its jurisdiction." *Royal & Sun Alliance*, 466 F.3d at 95. The Court

finds that this case presents such circumstances and that abstention is appropriate on comity grounds.

"In assessing whether 'exceptional circumstances' are present, a district court must identify 'considerations which are not generally present as a result of parallel litigation,' and carefully balance the 'totality of the circumstances.'" *Klonis*, 487 F. Supp. 2d at 355 (quoting *Royal & Sun Alliance*, 466 F.3d at 93-94). One relevant consideration is the connection between the litigation, the United States, and the foreign country. *See id.*

Plaintiffs' claims are inextricably connected to France. France publicly recognized its debt to these victims in 1995. (Executive Agreement at 1.) France then went on to establish, under French law, the Mattéoli Mission, the CIVS, and the Shoah Foundation. (*Id.* at 1-2.) By the Executive Agreement, it pledged to provide legal oversight to each of the alternative fora. (*Id.* at 4.) In recognition of the connection between France and the expropriations suffered by Plaintiffs, as well as the commitment of the French government to compensating these victims, the French and United States governments jointly expressed their view that the French alternative fora ought to be the "exclusive" means for addressing these claims. (*Id.*)

These circumstances militate strongly against permitting Plaintiffs to pursue their claims in United States courts. In *Bi v. Union Carbide Chems. & Plastics Co.*, 984 F.2d 582 (2d Cir. 1993), the Second Circuit considered a statute enacted by the Indian government in response to "the most devastating industrial disaster in history," which granted it exclusive authority to pursue victims' claims against

Union Carbide India Limited. *Id.* at 583. India used this statutory authority to settle all claims in its own courts. *Id.* at 583-84. India's Supreme Court reviewed the settlement and found that it was consistent with the Indian constitution, despite a lack of either notice to victims or approval from other aggrieved parties. *Id.* at 585.

Following judicial approval of the settlement, certain victims collaterally attacked it in United States courts. *Id.* at 584. The cases were assigned by the Multi-District Litigation Panel to the Southern District of New York, where they were dismissed on *forum non conveniens* grounds. *Id.* at 583. On appeal, the Second Circuit faced "an interesting issue of comity." *Id.* It reasoned that, "were we to pass judgment on the validity of India's response to a disaster that occurred within its borders, it would disrupt our relations with that country and frustrate the efforts of the international community to develop methods to deal with problems of this magnitude in the future." *Id.* at 586. The court found that abstention was appropriate, deferring "to the statute of a democratic country to resolve disputes created by a disaster of mass proportions that occurred within that country." *Id.*

*Bi*'s reasoning suggests that abstention is appropriate here as well. France created the CIVS and the Foundation by decrees of its government. It has stated publicly that it believes these fora should be the exclusive remedies for the class of victims that now seek relief in United States courts. Unlike in *Bi*, Plaintiffs' representatives participated in part of the settlement process and have expressed support of the full-scale operation of the CIVS and the Fund. (*See generally* Joint Statement.) The Executive Branch of

the United States also supports these alternative fora and has endeavored to make that support known, both generally through the Executive Agreement and directly in this litigation through its Statement of Interest.

It is true that, unlike in *Bi*, no law expressly requires that the alternative fora be the exclusive remedies for Plaintiffs. The Court is also mindful that, unlike in *Bi*, Plaintiffs' class is comprised of citizens of more than one country. Although the Executive Branch has not exercised its authority to affirmatively settle these Plaintiffs' claims, *see Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981), the Court is confident that the victims' representatives, as well as the French and United States governments, have considered their interests in developing the alternative fora. (*See* Joint Statement ¶¶ 1, 3; *id.* Annex A at 1, 4; Statement of Interest at 14-17.) Thus, while these distinctions may present the Court with a somewhat closer question, they do not change the fact that for this Court to sit in judgment of Plaintiffs' suit would interfere with France's efforts to redress these expropriations in the alternative fora.

The Executive Branch is "the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). Refusing to abstain here would imply that federal courts possess greater aptitude than both the Executive and the French government to compensate Holocaust victims for atrocities committed by other foreign states, which occurred outside United States borders. The Court is not prepared to make such a finding and declines to convey such an impression. Accordingly, based on principles of international comity, even if the

Court were to possess subject matter jurisdiction over France, it would abstain from deciding the eligible Plaintiffs' claims.

### 3. SNCF

SNCF argues that the Court should abstain from hearing this case because the litigation is "inextricably linked with foreign states and international diplomacy." (SNCF Mem. at 25.) As with France, in order for abstention to be appropriate based on principles of international comity, SNCF must show that the alternative fora are adequate and parallel, and that "additional circumstances" make abstention appropriate. *See Royal & Sun Alliance*, 466 F.3d at 94-95. For the reasons that follow, the eligible Plaintiffs' claims against SNCF are dismissed on comity grounds.

First, as discussed above, the mechanisms underling the CIVS, the Fund, and the Foundation satisfy the "adequacy" component of the international comity doctrine. *See id.* at 94.

Second, the French alternative fora provide mechanisms parallel to this litigation in which the eligible Plaintiffs may pursue compensation based on expropriations by SNCF. Plaintiffs' claims against SNCF in this action are somewhat different than their allegations against France and CDC. They allege that "[d]eportees were forced by SNCF to turn over their suitcases and other valuables when they were loaded on the trains; what was taken from them was never returned." (Compl. ¶ 8; *see also id.* ¶ 18.) Thus, they allege "material spoliations." (*See* Gélineau-Larrivet Decl. ¶¶ 30-31 (describing "Other Spoliations").) However, so long as Plaintiffs meet its eligibility criteria, the CIVS is available to hear these types of spoliation claims as well.

The Statement of Interest focuses on the CIVS as a means for redressing claims against banks, but, as the 2006 Chairman of the CIVS reports, "[a]ny person . . . who has been the victim of a material and/or financial spoliation, in connection with anti-Semitic legislation enacted during the Second World War in French or equivalent territory, may appeal to the CIVS." (Gélineau-Larrivet Decl. ¶ 10; *see also id.* ¶ 4.) The CIVS compensates for "[l]ootings of personal property, confiscations of . . . valuables and jewelry and liquidities of deportees at the time of their internment in camps in France," as well as "spoliations of works of art and business losses . . . ." (*Id.* ¶ 30.) Thus, the CIVS permits eligible Plaintiffs who were victimized by French anti-Semitic legislation to file claims relating to material spoliations based on actions by SNCF.

In fact, the majority of the claims filed with the CIVS and the compensation recommendations it has made have related to material spoliations. Of the 26,637 claims that have been recorded since the CIVS was created, 19,024 were based on non-banking spoliations. (*See id.* ¶ 9.) The CIVS made 18,477 compensation recommendations as of May 2006, 11,010 of which were based on material spoliations. (*Id.*) Therefore, the CIVS offers a parallel forum for Plaintiffs to file claims for material spoliation by SNCF. (*See id.* ¶¶ 30-31.) Although SNCF would not be an adverse litigant in the CIVS proceedings, its conduct nevertheless would be the subject of the CIVS's investigation. Accordingly, the Court finds that the issues and the parties are sufficiently similar to be deemed parallel under the comity analysis.

Finally, the circumstances of this case justify abstention based on comity principles. Plaintiffs allege that SNCF is "wholly owned by the French government" and the "national railway of France" (Compl. ¶ 25.) Thus, because Plaintiffs' theory of the case is that SNCF is an instrumentality of the French government, much of the Court's reasoning regarding the special circumstances justifying abstention from hearing the eligible Plaintiffs' claims against France applies with equal force here. This conclusion is bolstered by Plaintiffs' repeated allegation that France and SNCF acted in concert when effecting the alleged expropriations. (*See id.* ¶ 27 ("SNCF and French government officials participated in such confiscation."); *see also id.* ¶¶ 30, 31, 35, 36, 38, 39, 42, 43, 45, 49, 50.)

Consistent with its position in the Executive Agreement, France has informed the Court through its motion papers that "France, in addition to other public and private entities, has invested a substantial amount of time, effort, and money in the CIVS process and looks to that system as the exclusive means of adjudicating Holocaust-related claims. In fact, the French government has made it clear that it believes France should be the sole forum for the adjudication of spoliation claims such as Plaintiffs'." (France Mem. at 11.) This assertion by a foreign government does not *compel* abstention from claims against that government's instrumentalities, especially when the government itself is a party to the litigation. Nonetheless, France's position is entitled to some weight in the comity analysis. *Cf. Jota*, 157 F.3d at 160 (noting pre-dismissal relevance of Ecuador's letters to the court arguing, as a non-party, that the "case implicated Ecuador's sovereign interests and

should not be decided in a United States court").

As stated above, SNCF's position is supported by the fact that there is an "undeniably strong" connection between Plaintiffs' claims and France. *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 454 (2d Cir. 2000). The alternative fora, some members of Plaintiffs' proposed class, and SNCF witnesses are all located in France. *See Third Restatement of Foreign Relations Law* § 403(2) (noting that territorial connection to the litigation and importance of regulation to the foreign state are factors bearing on "reasonableness" of asserting jurisdiction). In addition to their claims before the CIVS, members of Plaintiffs' class have also retained French counsel and brought claims against SNCF in the Administrative Court of Toulouse, albeit for pain and suffering rather than restitution. (*See* Gremont Reply Decl. ¶¶ 3-4.) These actions demonstrate that SNCF is amenable to suit by Plaintiffs in France for at least some form of redress, and they further connect the dispute between these parties to France rather than the United States. *See Bigio*, 239 F.3d at 454 (suggesting that existence of alternate fora and defendant's amenability to suit in foreign jurisdiction should be considered in comity analysis).

The Court's comity analysis is informed both by the reasoning stated above with respect to France and for these additional reasons that apply specifically to SNCF. Therefore, abstention is appropriate as to claims against SNCF by those Plaintiffs who are eligible to seek compensation in the alternative fora.

V. CONCLUSION

Although the Court reaches a different conclusion than that advocated by Plaintiffs, there can be no doubt that Plaintiffs and their counsel have demonstrated a firm and steadfast commitment to "bringing justice to victims of the Nazi era" (Statement of Interest at 14), and to "accomplish[ing] a complete disgorgement of assets never restituted to their rightful owners" resulting from the unspeakable atrocities of the Holocaust (*id.* at 8). For this, Plaintiffs and Plaintiffs' counsel deserve, and have earned, the respect and admiration of the Court.

Nevertheless, for the reasons stated above, the Court finds that it lacks subject matter jurisdiction over CDC, SNCF, and France pursuant to the FSIA. Additionally, even if the FSIA permitted the Court to exercise jurisdiction over Defendants, the Court would abstain from deciding the eligible Plaintiffs' claims on justiciability grounds. Accordingly, Plaintiffs' action is dismissed as to all Defendants. The Clerk of the Court is respectfully directed to terminate the motions docketed as document numbers 14, 18, and 26, and to close this case.

Plaintiffs are represented in this matter by Harriet Tamen, Esq., Law Offices of Harriet Tamen, 212 East 39th Street, New York, NY 10016; Lucille Alice Roussin, Esq., 101 West 90 Street, New York, NY 10024; and Stephen Thran Rodd, Esq., Abbey Spanier Rodd Abrams & Paradis, LLP, 212 East 39th Street New York, NY 10016. Defendant CDC is represented by Karen M. Asner, Esq., Owen C. Pell, Esq., and Sali A. Rakower, Esq., White & Case LLP, 1155 Avenue of the Americas, New York, NY 10036. Defendant France is represented by Jeremy Goldman Epstein, Esq., Shearman & Sterling LLP, 599 Lexington Avenue, New York, NY 10022. Defendant SNCF is represented by Andreas Frank Lowenfeld, Esq., New York University School of Law, 40 Washington Square South, New York, NY 10012.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

\*       \*       \*

Dated: December 19th, 2008
New York, New York

41